**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-4030
_____

LOUISIANA FORESTRY ASSOCIATION INC.;
OUTDOOR AMUSEMENT BUSINESS ASSOCIATION
INC.; CRAWFISH PROCESSORS ALLIANCE; FOREST
RESOURCES ASSOCIATION INC.; AMERICAN HOTEL
& LODGING ASSOCIATION; AMERICAN SUGAR
CANE LEAGUE OF USA INC.,

Appellants

v.

SECRETARY UNITED STATES DEPARTMENT OF
LABOR; JANE OATES, in her official capacity as United
States Assistant Secretary of Labor Employment and Training
Administration; UNITED STATES DEPARTMENT OF
LABOR; SECRETARY UNITED STATES DEPARTMENT
OF HOMELAND SECURITY; UNITED STATES
DEPARTMENT OF HOMELAND SECURITY

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-11-cv-07687)
District Judge: Honorable Legrome D. Davis

_____

Argued May 31, 2013

Before:   JORDAN and VANASKIE, *Circuit Judges*, and
RAKOFF,* *District Judge*.

(Filed: February 5, 2014)

R. Wayne Pierce, Esq.        [*ARGUED*]
Pierce Law Firm
Suite 106
133 Defense Highway
Annapolis, MD 21401

Veronica W. Saltz, Esq.
Saltz Matkov
998 Old Eagle School Road
Suite 1206
Wayne, PA 19087

Leon R. Sequeira, Esq.
Seyfarth Shaw
975 F Street, N.W.
Washington, DC 20004
        *Counsel for Appellants*

Geoffrey Forney, Esq.        [*ARGUED*]
United States Department of Justice

---

*   Honorable Jed S. Rakoff, Senior Judge of the United States District Court for the Southern District of New York, sitting by designation.

Office of Immigration Litigation
Room 6223
450 5th Street, N.W.
Washington, DC 20001

Harry L. Sheinfeld, Esq.
United States Department of Labor
Office of the Solicitor
Room N-2101
200 Constitution Avenue, N.W.
Washington, DC 20210
*Counsel for Appellees*

Arthur N. Read, Esq.
Friends of Farmworkers, Inc.
42 South 15th Street
Suite 605
Philadelphia, PA 19102

Meredith B. Stewart, Esq.
Southern Poverty Law Center
1055 Saint Charles Avenue
Suite 505
New Orleans, LA 70130

Sarah M. Claassen, Esq.
Elizabeth D. Mauldin, Esq.
Centro de los Derechos del Migrante, Inc.
519 North Charles Street
Suite 260
Baltimore, MD 21201

Edward J. Tuddenham, Esq.          [*ARGUED*]

228 West 137th Street
New York, NY 10030
   *Counsel for Intervenors*

————————

OPINION OF THE COURT

————————

VANASKIE, *Circuit Judge.*

Appellants, a group of associations representing employers in non-agricultural industries, claim that the Department of Labor exceeded its authority by enacting a regulation governing the calculation of the minimum wage a U.S. employer must offer in order to recruit foreign workers under the H-2B visa program. The District Court granted summary judgment for the Department of Labor and its co-defendants, the Secretary of Labor, the Department of Homeland Security, and the Secretary of Homeland Security. Having concluded that the regulation was validly promulgated, we affirm the judgment of the District Court.

I.

On January 19, 2011, the Department of Labor (the "DOL") issued a new regulation governing the calculation of the minimum wage a U.S. employer must offer in order to recruit foreign workers as part of the H-2B visa program, which permits U.S. employers to recruit foreign workers to fill unskilled, non-agricultural positions that no qualified U.S. worker will accept. *See* Wage Methodology for the Temporary Non-agricultural Employment H-2B Program, 76 Fed. Reg. 3,452 (Jan. 19, 2011) (codified at 20 C.F.R. § 655.10) (the "2011 Wage Rule"). In September 2011,

4

Appellants—a group of associations representing employers in non-agricultural industries which recruit H-2B workers and stand to face higher labor costs as a result of the 2011 Wage Rule[1]—challenged the validity of the 2011 Rule by initiating an action against the Department of Labor, the Department of Homeland Security, and the Secretaries of the respective agencies. Also party to this appeal is a group of individuals and organizations representing foreign and U.S. workers impacted by the H-2B program ("the Intervenors").[2] The Intervenors were plaintiffs in a prior suit that successfully challenged the 2008 Wage Rule, the predecessor to the 2011 Wage Rule.

## A. STATUTORY AND REGULATORY FRAMEWORK

### 1. The H-2B Visa Program

The Immigration and Nationality Act of 1952 established the modern framework for regulation of immigration in the United States, including provisions for the admission of permanent and temporary foreign workers. *See*

---

[1] The five appellants are the Louisiana Forestry Association, Inc.; Outdoor Amusement Business Association, Inc.; Forest Resource Association, Inc.; American Hotel and Lodging Association; and American Sugar Cane League of U.S.A., Inc.

[2] The eight intervenors are Jahamel Abuleche, Romulo Abuleche, Comite Apoyo de los Trabajadores Agricolas, Mark Cunanan, Salvador Martinez Barrera, Pineros Campesinos Unidos del Noroeste, Jesus Vite Lopez, and the Alliance of Forest Workers and Harvesters.

Immigration and Nationality Act of 1952 ("INA"), Pub. L. No. 82-414, 66 Stat. 163 (codified as amended at 8 U.S.C. §§ 1101 et seq.). One such provision was the H-2 visa program, which governed the recruitment of unskilled foreign workers for agricultural and non-agricultural jobs. *Id.* § 101(a)(15)(H)(ii). In 1986, Congress enacted the Immigration Reform and Control Act of 1986 ("IRCA"), which amended the INA by, among other things, bifurcating the H-2 visa program into the H-2A and H-2B programs, which govern the admission of agricultural and non-agricultural workers, respectively. *See* Pub. L. No. 99-603, § 301(a), 100 Stat. 3359, 3411 (amending 8 U.S.C. § 1101(a)(15)(H)(ii)(a)-(b)). Named for the statutory section under which it was created, the H-2B program permits U.S. employers to recruit and hire temporary unskilled, non-agricultural workers from abroad to fill positions that no qualified U.S. worker will accept. *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(b) (stating that U.S. employers may hire an individual "having residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform other temporary service or labor if unemployed persons capable of performing such service or labor cannot be found in this country . . . .").

Congress initially charged the Attorney General of the United States with implementing the INA, including the provisions of the Act governing the H-2 visa program. *See* 8 U.S.C. § 1184(a)(1). In 2002, Congress abolished the Immigration and Naturalization Service ("INS"), *see* 6 U.S.C. § 291, and transferred jurisdiction to enforce and administer the nation's immigration laws from the Attorney General to the Secretary of Homeland Security. *See* 6 U.S.C. §§ 202, 557. Thus the authority to determine nonimmigrant visa

petitions now rests with the Bureau of Citizenship and Immigration Services, an agency within the Department of Homeland Security ("DHS"). *See id.* § 271(b).

The authority to administer the H-2B program is vested in the DHS pursuant to section 1184(c) of the INA, which directs that "[t]he question of any alien as a nonimmigrant under 8 U.S.C. § 1005(a)(15)(H) shall be determined by the [DHS] after consultation with appropriate agencies of the Government, upon petition of the importing employer." 8 U.S.C. § 1184(c)(1).[3] The DHS has by regulation designated the DOL as the agency from which it seeks "advice" in determining whether to grant H-2B visa petitions. 8 C.F.R. § 214.2(h)(6)(iii) (2013). Specifically, the DHS requires an employer seeking an H-2B visa to first "apply for a temporary labor certification with the Secretary of Labor" prior to filing the visa petition. *Id.* § 214.2(h)(6)(iii)(A). The regulation further provides that "[t]he labor certification shall be advice to the director [of the DHS] on [1] whether or not United States workers capable of performing the temporary services or labor are available and [2] whether or not the alien's employment will adversely affect the wages and working conditions of similarly employed United States workers." *Id.* In other words, the DOL's temporary labor certifications advise the DHS whether two of the INA's several statutory requirements for issuance of an H-2B visa have been satisfied. *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(b). The DHS has also by regulation

---

[3] For the reasons explained above, all statutory references to the "Attorney General" in this context are now deemed to refer to the Secretary of Homeland Security. *See* 6 U.S.C. § 557.

endowed the DOL with the authority to create the procedures necessary to fulfill its charge of issuing labor certifications:

> The secretary of labor shall separately establish for the temporary labor program under his or her jurisdiction, by regulation at 20 CFR [§] 655, procedures for administering th[e] temporary labor program . . . and shall determine the prevailing wage applicable to an application for temporary labor certification for that temporary labor program in accordance with the Secretary of Labor's regulation at 20 CFR [§] 655.10.

8 C.F.R. § 214.2(h)(6)(iii)(D). The DHS has explained that it "must seek advice from the [DOL] under the H-2B classification because the statute requires a showing that unemployed U.S. workers are not available to perform the services before a petition can be approved. The [DOL] is the appropriate agency of the Government to make such a labor market finding." Temporary Alien Workers Seeking Classification Under the Immigration and Nationality Act, 55 Fed. Reg. 2,606, 2,617 (Jan. 26, 1990) (to be codified at 8 C.F.R. § 214.2(h)).

In sum, the process for obtaining an H-2B visa proceeds in two general stages. First, an employer must obtain a temporary labor certification from the DOL. *See* 8 C.F.R. § 214.2(h)(6)(iii)(A). This requires the employer to apply to the DOL for a prevailing wage determination for the

8

area of intended employment. *See* 20 C.F.R. § 655.10. The DOL then calculates the prevailing wage based upon pertinent regulations, *e.g.*, the 2008 or 2011 Wage Rules. *Id.* The employer must also submit a work order with the state workforce agency serving the geographical area of intended employment and advertise the position at a wage equal to or higher than the prevailing wage as determined by the DOL. *Id.* Once these conditions have been satisfied, the DOL will issue the labor certification, which serves as the DOL's verification that the employer has demonstrated that "there is an insufficient number of U.S. workers who are qualified and who will be available for the job opportunity for which certification is sought and that the employment of the H-2B workers will not adversely affect the benefits, wages, and working conditions of similarly employed U.S. workers." *Id.* § 655.50(b). Only after the DOL issues the labor certification may an employer proceed to the second stage of the process: filing an H-2B visa application with the DHS. *See* 8 C.F.R. § 214.2(h)(6)(iii)(C), (E). Although the DOL's labor certification is a prerequisite to obtaining an H-2B visa petition, the authority to grant or deny an H-2B visa petition ultimately rests with the DHS alone. *See* 8 U.S.C. § 1184(c).

## 2. *The DOL's Historical Role in the Administration of the H-2B Program*

The DOL has played a role in the administration of the nation's immigration laws in general, and the admission of foreign workers in particular, since the Department's inception in 1913. At the time the DOL was established, the Department "housed the Bureau of Immigration and the Bureau of Naturalization," and "[a]s early as 1917, the Secretary of Labor and the Bureau of Immigration, then part of the DOL, worked together to manage the importation of

9

laborers into the United States." *La. Forestry Ass'n v. Solis*, 889 F. Supp. 2d 711, 716 n.2 (E.D. Pa. 2012) (citations omitted). The Bureaus of Immigration and Naturalization merged in 1933 to form the INS, which remained part of the DOL until 1940 when it was transferred to the Department of Justice. *Id.*

The INS has long required employers seeking to admit workers under the H-2 program to first obtain "a certification from the Secretary of Labor or his designated representative stating that qualified persons in the United States are not available and that the employment policies of the [DOL] have been observed . . . ." Miscellaneous Amendments, 31 Fed. Reg. 4,446 (Mar. 16, 1966) (codified at 8 C.F.R. § 214.2). In 1968, pursuant to these provisions, the DOL formally issued regulations of its own governing the certification process for the first time. *See* Certification of Temporary Foreign Labor for Industries Other than Agriculture or Logging, 33 Fed. Reg. 7,570–71 (May 22, 1968) (codified at 20 C.F.R. § 621). In later years, the DOL amended the regulations governing the certification process. *See, e.g.,* Labor Certification Process, 43 Fed. Reg. 10,306 (Mar. 10, 1978) (codified in scattered sections of 20 C.F.R.).

The DOL continued its role in the administration of both the H-2A and H-2B visa programs after Congress's passage of the IRCA bifurcated the H-2 program in 1986. Although the IRCA was silent as to the DOL's rulemaking authority concerning the H-2B program,[4] *see* IRCA § 301(a),

---

[4] By contrast, Congress expressly granted DOL limited rulemaking authority over the H-2A program. *See* IRCA § 301(b) ("Section 214(c) (8 U.S.C. 1184(c)) is amended by adding at the end the following: 'For purposes of

the INS and its successor, the DHS, continued to authorize the DOL's involvement pursuant to their own agency regulations. *See, e.g.*, 8 C.F.R. § 214.2(h). During the first two decades of the H-2B program's existence, the DOL issued, without notice and comment, a series of General Administration Letters governing the determination of the prevailing wage rate for the H-2B program. *See, e.g.*, Interim Prevailing Wage Policy for Nonagricultural Immigration Programs, Gen Admin. Ltr., No. 4-95 (Dep't of Labor May 18, 1995), *available at* http://wdr.doleta.gov/directives/attach/GAL4-95_attach.pdf. In sum, these letters set the prevailing wage at the rate negotiated under a governing collective bargaining agreement ("CBA"), or, if no CBA existed, the rate as determined under the Davis-Bacon Act ("DBA"), 40 U.S.C. §§ 3141 *et seq.*, or McNamara-O'Hara Service Contract Act ("SCA"), 41 U.S.C. §§ 6701 *et seq*. *See id.* at 1–2. In the event that no CBA, DBA, or SCA wage rate was available, the prevailing wage was determined by wage surveys. *Id.* at 2. In 1998, the DOL first used the Occupational Employment Statistics ("OES") survey as the source for determining the prevailing wage where no CBA, DBA, or SCA rate existed. *See* Prevailing Wage Policy for Nonagricultural Immigration Programs, Gen. Admin. Ltr., No. 2-98 (Dep't of Labor Oct. 31, 1997), *available at* http://wdr.doleta.gov/directives/attach/GAL2-98_attach.pdf. During this time, the DOL also began to consider "skill level" in determining the prevailing wage, classifying H-2B employment opportunities as either "entry

this subsection with respect to nonimmigrants described in section 101(a)(15)(H)(ii)(a), the term 'appropriate agencies of Government' means the Department of Labor and includes the Department of Agriculture.'").

11

level" or "experienced level" and considering the skill level of an occupation as one of several factors affecting the prevailing wage rate for that job. *See* Gen. Admin. Ltr. 4-95, at 5–6.

The DOL abandoned the two-tier approach in 2005 and instead adopted the wage calculation methodology used in administering the H-1B program, which governs the temporary admission of aliens in skilled, specialty occupations. *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b). Under the H-1B program's wage calculation regime, the prevailing wage is determined by a four-tier system based on the skill level required for the occupation.[5] *See id.* § 1182(p)(4). The

---

[5] The H-1B program's four-tier system for determining the prevailing wage is set forth in 8 U.S.C. § 1182(p)(4), which provides:

> Where the Secretary of Labor uses, or makes available to employers, a governmental survey to determine the prevailing wage, such survey shall provide at least 4 levels of wages commensurate with experience, education, and the level of supervision. Where an existing government survey has only 2 levels, 2 intermediate levels may be created by dividing by 3, the difference between the 2 levels offered, adding the quotient thus obtained to the first level and

12

DOL first applied the four-tier methodology to the H-2B visa program in a 2005 letter, which, like its predecessors, was issued without notice and comment. *See* Mem. To SWA Adm'rs from Emily Stover DeRocco, Asst. Sec'y for Emp't & Training, Revised Prevailing Wage Determination Guidance (May 17, 2005). "That letter also announced that in the absence of a CBA, the DOL would use the OES program as the main source of data for establishing prevailing wages." *Id.*

In 2008, for the first time since the 1960s, the DOL promulgated a regulation governing the labor certification process through notice and comment rulemaking. *See* Labor Certification Process and Enforcement for Temporary Employment in Occupations Other Than Agriculture (H-2B Workers), 73 Fed. Reg. 78,020 (Dec. 19, 2008) (codified at 20 C.F.R. §§655–56) (the "2008 Wage Rule"). The 2008 Wage Rule codified several aspects of the DOL's guidance in the 2005 letter discussed above. For example, the 2008 Rule provided that the four-tier methodology borrowed from the H-1B program should be used to calculate the prevailing wage. *See id.* at 78,020, 78,029, 78,056. The 2008 Rule further required that the prevailing wage be determined by the rate specified by the governing CBA, or, in the absence of a CBA, "the arithmetic mean . . . of the wages of workers similarly employed at the skill level in the area of intended employment[,]" as calculated using OES data. *Id.* at 78,056. The Rule alternatively permitted use of employer surveys to establish the prevailing wage, provided certain conditions were satisfied. *See id.*

---

subtracting that quotient from the second level.

13

*3. Subsequent Litigation and Rulemaking*

In 2009, a group of individuals and organizations representing foreign and U.S. workers impacted by the H-2B program[6] initiated an action in the District Court for the Eastern District of Pennsylvania challenging the validity of the 2008 Wage Rule. *See Comite de Apoyo a los Trabajadores Agricolas v. Solis*, No. 09-240, 2010 WL 3431761 (E.D. Pa. Aug. 30, 2010) ("*CATA I*" or "the *CATA* litigation").[7] The *CATA* plaintiffs alleged that several provisions of the 2008 Wage Rule, including the provision governing the calculation of the prevailing wage rate, violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.* The District Court agreed, holding that the DOL violated the APA in promulgating the 2008 Wage Rule by, among other things, importing into the H-2B program the H-1B program's four-tier wage calculation methodology, and by relying on OES data, rather than DBA or SCA data, to set the prevailing wage, without subjecting either provision to notice and comment.[8] *See id.* at *4–7, 19, 25. Citing concerns that

---

[6] As discussed in part I *supra*, these individuals are the Intervenors in this appeal.

[7] The *CATA* litigation, like this case, was originally assigned to Judge Pollak. Both cases were reassigned to Judge Davis following Judge Pollak's death in May 2012.

[8] The District Court explained that although "[a]s a general matter, of course, DOL's [2008 Wage Rule] w[as] subjected to notice and comment," the DOL 'expressly refused to consider comments concerning the choice of appropriate data sets' and the four-tier methodology." *CATA*

vacating the 2008 Wage Rule would result in a regulatory gap and leave the DOL with no method by which to calculate the prevailing wage, the District Court ordered the DOL to promulgate a replacement rule within 120 days, leaving intact the four-tier method until a new regulation was issued. *Id.* at 25.

In response to the District Court's decision, the DOL issued a notice of proposed rulemaking ("NPRM") setting forth a new method for calculating the prevailing wage. *See* Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program, 75 Fed. Reg. 61,578 (proposed Oct. 5, 2010) (to be codified at 20 C.F.R. § 655.10) (the "Proposed 2011 Wage Rule"). The Proposed 2011 Wage Rule eliminated the four-tier skill-level methodology, and, as the NPRM explained, reflected the DOL's concern that the four-tier regime did not produce "the appropriate wage necessary to ensure U.S. workers are not adversely affected by the employment of H-2B workers." *Id.* at 61,579. The Proposed Rule defined the prevailing wage as "the highest of the following: Wages established under an agreed-upon [CBA] . . .; a wage rate established under the DBA or SCA for that occupation in the area of intended employment; and the arithmetic mean wage rate established by the OES for that occupation in the area of intended employment." *Id.* The DOL explained that the Proposed Rule would "best achieve the Department's policy objectives of ensuring that wages of U.S. workers are more adequately protected and, thus, that

*I*, 2010 WL 3431761, at *19. The District Court thus concluded that the provisions were "improperly promulgated without acceptance and consideration of comments as required by the APA." *Id.*

15

employers are only permitted to bring H-2B workers into the country where the wages and working conditions of U.S. workers will not be adversely affected." *Id.* at 61,581.

On January 19, 2011, the DOL published a final version of the 2011 Wage Rule, which is the subject of this appeal. *See* Wage Methodology for the Temporary Non-agricultural Employment H-2B Program, 76 Fed. Reg. 3,452 (Jan. 19, 2011) (codified at 20 C.F.R. § 655.10) (the "2011 Wage Rule"). In its final form, the 2011 Wage Rule establishes a wage calculation regime wherein the prevailing wage is the highest of the applicable CBA; the rate established under the DBA or SCA; or the OES mean. *Id.* at 3,453, 3,484. The 2011 Wage Rule eliminates the four-tier methodology from the wage calculation regime "in favor of the mean OES wage for each occupational category," and likewise bars the use of employer-submitted surveys if the prevailing wage can be determined based on OES data or the rates established under the DBA or SCA. *Id.* The notice of the final rule provided that the 2011 Wage Rule would take effect after a one-year delay, on January 1, 2012. *Id.* at 3,452.

The DOL relied upon both the INA and DHS regulations as the basis for its authority to promulgate the 2011 Wage Rule. Specifically, the DOL pointed to 8 U.S.C. § 1184(c)(1) and 8 C.F.R. § 214.2(h)(6), explaining:

> Section 214(c)(1) of the INA requires DHS to consult with appropriate agencies before approving an H-2B visa petition. 8 U.S.C. [§] 1184(c)(1). That consultation occurs according to a . . . regulatory requirement that an

16

employer first obtain a temporary certification from the Secretary of Labor (the Secretary) establishing that U.S workers capable of performing the services or labor are not available, and that the employment of the foreign worker(s) will not adversely affect the wages and working conditions of similarly employed U.S. workers. 8 C.F.R. [§] 214.2(h)(6).

The Secretary's responsibility for the H-2B program is carried out by two agencies with the Department. Applications for labor certification are processed by the Office of Foreign Labor Certification (OFLC) in the Employment and Training Administration (ETA), the agency to which the Secretary has delegated those responsibilities described in . . . the H-2B regulations. Enforcement of the attestations and assurances made by employers in H-2B applications for labor certification is conducted by the Wage and Hour Division (WHD) under enforcement authority delegated

to it by DHS. 8 U.S.C. [§] 1184(c)(14)(B).

*Id.* at 3,452. The DOL further noted that according to its estimates, "the change in the method of determining wages will result in a $4.83 increase in the weighted average hourly wage for H-2B workers and similarly employed U.S. workers[,]" and a total annual transfer cost of $847.4 million.[9] *Id.* at 3,469, 3,471.

Four months later, the DOL published a notice in the *Federal Register* informing the public that H-2B employers would be expected to comply with the new prevailing wage rate when it took effect on January 1, 2012. *See* Application of the Prevailing Wage Methodology in the H-2B Program, 76 Fed. Reg. 21,036, 21,036–37 (Apr. 14, 2011). At that time, the DOL also published a new appendix to the standard H-2B visa application form, which all employers are required to sign to obtain a labor certification from the DOL. *See id.;* s*ee also* J.A. 185. The appendix added a requirement that a signatory employer certify that "[t]he offered wage equals or exceeds the highest of the most recent prevailing wage that is or will be issued by the [DOL] to the employer for the time period the work is performed." J.A. 185.

Although the 2011 Wage Rule was set to take effect on January 1, 2012, the *CATA* plaintiffs-Intervenors successfully challenged and accelerated its effective date. *See Comite de Apoyo a los Trabajadores Agricolas v. Solis,* 2011 WL

---

[9] The total annual transfer cost is defined as the total additional wages employers participating in the H-2B program would be required to pay foreign workers recruited under the program. *See* 76 Fed. Reg. 3,471.

2414555, at *3-4 (E.D. Pa. June 16, 2011) ("*CATA II*"). On June 16, 2011, the District Court vacated the effective date of January 1, 2012, and ordered the DOL to issue a new effective date through notice and comment rulemaking. *Id.* at *5. After providing the public an opportunity to comment on the new date, the DOL issued a final rule accelerating the 2011 Rule's effective date to September 30, 2011. *See* Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program; Amendment of Effective Date, 76 Fed. Reg. 45,667, 45,673 (Aug. 1, 2011).

The DOL subsequently postponed implementation of the 2011 Wage Rule, however, in response to provisions in riders to appropriations bills in which Congress expressly defunded implementation of the 2011 Rule. *See, e.g.*, Consolidated and Further Continuing Appropriations Act, 2012, Pub. L. 112-55, 125 Stat. 552, Div. B, Title V § 546 (2011); Consolidated Appropriations Act, 2012, Pub. L. 112-74, 125 Stat. 786, Div. F, Title I § 110 (2011); Continuing Appropriations Resolution, 2013, H.J. Res. 117, 112th Cong., 126 Stat. 1313 (2012); Consolidated and Further Continuing Appropriations Act, 2013, Pub. L. 113-6, 127 Stat. 198, Div. F, Title 5 (2013). In the interim, the DOL continued to use the 2008 Wage Rule to calculate the prevailing wage for H-2B visa applications. Although the DOL readily acknowledged that the 2008 Rule was invalid, it was unable to enforce the 2011 Wage Rule because, as discussed above, Congress continued to renew appropriations bans defunding the Rule's implementation. Thus, in September 2012, the *CATA* plaintiffs-Intervenors moved to vacate the 2008 Wage Rule, and for preliminary and permanent injunctions barring its use.

On March 21, 2013, the District Court granted the requested relief, vacating the provisions of the 2008 Wage Rule found to be invalid in its order of August 30, 2010. *See Comite de Apoyo a los Trabajadores Agricolas v. Solis*, 933 F. Supp. 2d 700 ("*CATA III*")*.* The District Court observed that the DOL admitted that the 2008 Wage Rule "is procedurally and substantively invalid," and explained why vacatur, which it had deemed inappropriate at the time it invalidated provisions of the 2008 Wage Rule in August of 2010, was now the proper remedy:

> [A]fter the DOL acknowledged the 2008 Wage Rule's defects and promulgated an unsuccessful replacement rule, the DOL stopped entirely in its tracks. The DOL now expresses that it has no intention of taking further action to bring the DOL's H-2B labor certification into statutory and regulatory compliance and instead urges that we leave undisturbed a rule that this Court found procedurally invalid thirty months ago and that has since been declared substantively invalid by the very agency that now urges us to leave the Rule in place.

*Id.* at 713–14. The District Court thus granted a permanent injunction, and ordered that the 2008 Wage Rule be vacated and the DOL "come into compliance within thirty (30) days." *Id.* at 716.

In response to the District Court's order vacating the 2008 Wage Rule, the DOL and the DHS issued a final interim rule on April 24, 2013. *See* Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program, Part 2, 78 Fed. Reg. 24,047, 24,047–48 (Apr. 24, 2013) (codified at 8 C.F.R. §§ 214.2, 655.10) (the "2013 Interim Rule"). Like the 2011 Wage Rule, the 2013 Interim Rule eliminates the four-tier wage calculation methodology and provides that the prevailing wage will be "the arithmetic mean wage established in the OES survey, without the four levels." *Id.* at 24,053. And, like the 2008 and 2011 Wage Rules, the Interim Rule permits the prevailing wage to be determined by the rate established in a governing CBA. *Id.* In contrast to the 2011 Wage Rule, however, the Interim Rule permits, but does not require, "an employer to use a prevailing wage determination based on the DBA or SCA." *Id.* at 24,054. The Interim Rule leaves intact the 2008 Wage Rule's provision allowing use of employer-provided surveys to calculate the prevailing wage, replacing the 2011 Wage Rule's more stringent provision restricting use of employer surveys to only very "limited circumstances." *Id.* at 24,054–55. The Departments called for comments from the public regarding each of these provisions. *Id.* at 24,053–55.

As the basis for their respective authority to issue the 2013 Interim Rule, the Departments cited the INA and DHS regulations, explaining:

> Section 214(c)(1) requires DHS to consult with "appropriate agencies of the Government" before adjudicating an H-2B petition. DHS has determined that, under this statutory

21

provision, it must consult with DOL as part of the process of adjudicating H-2B petitions because DOL is the agency best situated to provide advice regarding whether "unemployed persons capable of performing such service or labor cannot be found in this country." 8 U.S.C. [§] 1101(a)(15)(H)(ii)(b). DHS, in conjunction with DOL, has determined that the best way to provide this consultation is by requiring the employer . . . prior to filing an H-2B petition, to first apply for a temporary labor certification from the Secretary of Labor. 8 CFR [§] 214.2(h)(6)(iii)(A).

*Id.* at 24,048. The Departments emphasized that the DHS and its predecessor, the INS, have consulted with the DOL in administering the H-2B program since 1968, and that the Rule "contains certain revisions to DHS's H-2B rule to clarify that DHS is the Executive Branch agency charged with making determinations regarding eligibility for H-2B classification, after consulting with DOL for its advice about matters with which DOL has expertise, particularly, in this case, questions about the methodology for setting the prevailing wage in the H-2B program." *Id.* at 24,048–49. The Departments further explained that the 2013 Interim Rule was issued "in response to the [District] [C]ourt's order in [*CATA III*] . . . and to ensure that there is no question that the

22

rule is in effect nationwide in light of other outstanding litigation." *Id.* at 24,048.

The 2013 Interim Rule was made effective immediately, pursuant to the "good cause" exception to the APA's requirement that agency rules be subject to a notice and comment period and take effect no sooner than 30 days after the final rule is published. *Id.* at 24,055–56 (citing 5 U.S.C. § 553(b)(B), (d)(3)). According to the supplementary information to the Interim Final Rule, as well as the DOL's briefing in this case, the Interim Rule is effective only "on a temporary basis," until the 2011 Wage Rule takes effect. *Id.* at 24,056; Appellants' Supp. Br. at 1-5.

On August 30, 2013, the DOL issued a rule in which it indefinitely delayed the effective date of the 2011 Wage Rule "to comply with recurrent legislation that prohibits [the Department] from using any funds to implement it, and to permit time for consideration of public comments sought in conjunction with [the 2013 Interim Final Rule] published April 24, 2013, 78 [Fed. Reg.] 24[,]047." *See* Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program; Delay of Effective Date, 78 Fed. Reg. 53,643 (Aug. 30, 2013) (the "Delay Rule"). The DOL noted, however, that:

> If Congress no longer prohibits implementation of the 2011 Wage Rule, the Department will publish a document in the Federal Register within 45 days of that event apprising the public of the status of 20 CFR [§] 655.10 and

23

the effective date of the 2011
Wage Rule.

*Id.* at 53,645.  Under the Department of Labor Appropriations Act, 2014, effective January 17, 2014, Congress lifted the appropriations ban on the 2011 Wage Rule.  *See* Pub. L. 113-76, Div. H, Title I (2014).[10]

## B. FACTUAL AND PROCEDURAL BACKGROUND

---

[10] The parties jointly maintain that this appeal remains ripe despite the DOL's stay of the 2011 Wage Rule.  We agree.  This case involves a facial challenge to an administrative rule, now fully funded, that the parties expect to be implemented swiftly and with a direct and foreseeable impact.  Because no further factual development is necessary and the remaining issues are purely legal challenges to a "final agency action," 5 U.S.C. § 704, the matter is thus "fit[] . . . for judicial decision," *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated by on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  And because we discern no institutional interest in delay, and none is otherwise offered, we need not consider hardship to the parties.  *See Owner-Operator Independent Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 656 F.3d 580, 586 (citing *Sabre, Inc. v. Dep't of Transp.*, 429 F.3d 1113, 1119 (D.C. Cir. 2005)).  Moreover, certain parties to this appeal have expressed in concrete terms that delay in our assessment of the Rule's validity constitutes a potentially grievous hardship for purposes of business planning and places them in a "very real dilemma."  *Abbott Labs*, 387 U.S. at 153.

24

On September 7, 2011, Appellants initiated the present action in the United States District Court for the Western District of Louisiana challenging the validity of the 2011 Wage Rule on the grounds that it was promulgated in violation of both the APA and the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601 *et seq.*[11] Appellants requested both declaratory and injunctive relief. The *CATA* plaintiffs-Intervenors subsequently filed an unopposed motion to intervene based on principles of comity. On December 13, 2011, the District Court "issued an order transferring venue and denying, without prejudice, the [Appellants'] motion for a preliminary injunction." *See La. Forestry Ass'n v. Solis*, 814 F. Supp. 2d 655, 665 (W.D. La. 2011).

Upon transfer to the District Court for the Eastern District of Pennsylvania, the parties filed cross-motions for summary judgment. Appellants presented two primary challenges to the 2011 Rule: first, that the DOL lacks authority to promulgate legislative rules concerning the H-2B program, and second, that even if the DOL has such rulemaking authority, the DOL's violation of certain procedural requirements of the APA and RFA invalidates the Rule entirely.

On August 20, 2012, the District Court issued a decision and order granting the defendants' motion for summary judgment.[12] *See La. Forestry Ass'n v. Solis*, 889 F.

---

[11] Appellants also challenged the DOL's acceleration of the effective date of the 2011 Wage Rule from January 1, 2012 to September 30, 2011. The DOL's later postponement of the effective date mooted those claims.

[12] The District Court heard oral argument on June 28, 2012, at which time the parties expressed doubt that the

25

Supp. 2d 711 (E.D. Pa. 2012). The District Court first rejected Appellants' arguments regarding the DOL's rulemaking authority, beginning with Appellants' contention that the DHS unlawfully conditioned "its own granting of H-2B visas on the receipt of labor certifications from the DOL" pursuant to 8 C.F.R. § 214.2(h)(6)(iii)(A). *Id.* at 722. Instead, the District Court determined that:

> It was eminently reasonable for the DHS to do so because the DOL is uniquely qualified to provide advice about the potential effects of H-2B workers' employment on United States workers, and because the DOL has been charged for decades with the responsibility of issuing labor certifications to employers seeking to hire temporary foreign workers.

*Id.* at 724. The District Court thus found that the DHS decision to adopt the DOL labor certification was entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Id.* at 723–25. The District Court also noted that it "would have come to the same conclusion even under a less deferential, *Skidmore*-type standard of review." *Id.* at 725 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).

---

dispute over the 2011 Rule's validity would be resolved by congressional action, *i.e.*, funding for implementation of the Rule.

26

The District Court then dismissed the argument that the DHS "improperly 'offloaded' some of its jurisdiction to the DOL by making the DOL a 'co-determiner' of H-2B visa petitions." *Id.* at 725. The District Court explained:

> DHS takes the DOL's advice on the labor certification question because DHS understands that the DOL has unrivaled expertise in this particular field. But it is still just a "consultation," which the INA expressly permits.
>
> This conclusion is bolstered by review of other cases in which an administrative agency has conditioned the exercise of its own authority on the decision of another entity.

*Id.* at 725–26 (citing *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 567 (D.C. Cir. 2004)). The District Court likewise rejected the contention that "in enacting the INA, Congress unlawfully delegated its legislative power to the DOL by failing to lay down an 'intelligible principle' that 'meaningfully constrains' DOL's discretion." *Id.* at 726–27.

Citing the history of the H-2B program, the statutory text of the INA, and the policy goals at issue, the District Court concluded that the INA, as amended by IRCA, confers

27

implied rulemaking authority on the DOL,[13] and the DOL had not exceeded the scope of that authority in issuing the 2011 Wage Rule. *Id.* at 728–30. Instead, "[t]he agencies' interpretation of 8 C.F.R. § 214.2(h)(6)(iii) [as conferring rulemaking authority on the DOL] is not plainly erroneous or inconsistent with the regulation" and "comports with the judicial preference for filling the interstices of the law through quasi-legislative enactment of rules of general applicability." *Id.* at 730. Lastly, the District Court rejected Appellants' claims that the DOL violated the APA and RFA when it promulgated the 2011 Wage Rule. *See id.* at 732–38.

## II.

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 611(a) and 704, and we have appellate jurisdiction under 28 U.S.C. § 1291. We review a district court's grant of summary judgment in a case brought under the APA *de novo*, "apply[ing] the applicable standard of review to the underlying agency decision." *Cyberworld Enter. Techs., Inc. v. Napolitano*, 602 F.3d 189, 195–96 (3d Cir. 2010). Under the APA, we must set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C)–(D). Appellants challenge both the DOL's general rulemaking authority in the context of the H-2B program, as well as its compliance with the requirements

---

[13] The DOL conceded that it lacks express statutory authority to engage in such rulemaking. *See La. Forestry Ass'n*, 889 F. Supp. 2d at 728.

28

of the APA and the INA in promulgating the 2011 Wage Rule.

A.

We turn first to Appellants' claim that there exists no legal basis—statutory or otherwise—upon which the DOL may predicate its rulemaking concerning the H-2B program.[14] Appellants contend that the DHS unlawfully subdelegated its authority over the H-2B program to the DOL, and thus the District Court erred when it rejected this argument and found that the DHS lawfully conditioned its granting of H-2B visa petitions on labor certifications from the DOL. According to the Departments, on the other hand, the DOL does not seek to justify its rulemaking in the H-2B context pursuant to a delegation theory. Rather, the Departments assert that the DOL has authority to promulgate rules concerning the H-2B program because the DHS lawfully conditioned its granting of H-2B petitions on obtaining a labor certification from the DOL and permissibly endowed the DOL limited rulemaking

---

[14] The Departments contend that Appellants never argued that the DOL lacks statutory authority to issue rules concerning the H-2B program during the administrative rulemaking proceedings, and thus the argument should be deemed waived for failure to exhaust administrative remedies. We disagree. Even if Appellants failed to challenge the DOL's rulemaking authority on this ground during the administrative rulemaking process, the claim is not waived. "[E]xhaustion of administrative remedies is not required when the issue involves only statutory construction, because there is no need for the administrative agency to develop a factual record or apply its expertise." *Bradshaw v. Carlson*, 682 F.3d 1050, 1052 (3d Cir. 1981).

29

authority to carry out its charge of issuing certifications. For the reasons set forth below, we find that the DOL has authority to promulgate rules concerning the temporary labor certification process in the context of the H-2B program, and that the 2011 Wage Rule was validly promulgated pursuant to that authority. This authority derives from regulation 214.2(h)(6)(iii), which was promulgated pursuant to the DHS's authority under sections 1101(a)(15)(H)(ii)(b) and 1184(c) of the INA to administer the nation's immigration laws, generally, and the H-2B program, specifically. *See* 6 U.S.C. §§ 202, 271(b); 8 U.S.C. § 1184(c).

1.

As an initial matter, we must resolve the parties' dispute as to whether the DHS's interpretation of the INA as permitting it to require H-2B petitioners to first obtain a temporary labor certification from the DOL is entitled to *Chevron* deference. Appellants argue that the DHS's interpretation of the governing statutory provisions is not entitled to deference under *Chevron* because the statutes—and particularly section 1184(c)—do not contain ambiguous language. The Departments and Intervenors, on the other hand, contend that *Chevron* deference is warranted because "Congress left a gap for DHS to fill when it charged DHS to consult with appropriate agencies," and the "DHS' interpretation of the gap as requiring a labor certification from the DOL is reasonable." Intervenors' Br. at 37.

"[A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in

30

the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). Here, Congress endowed the DHS with general authority to administer the nation's immigration laws. *See* 6 U.S.C. § 202. With regard to the H-2B program, Congress has specifically delegated to DHS the authority to "prescribe" by regulation the conditions under which aliens may be admitted to the United States, and the authority to "determine[]" H-2B petitions "after consultation with appropriate agencies of the Government." 8 U.S.C. § 1184(a), (c)(1). Acting pursuant to this statutory authority, DHS has issued regulations of its own requiring employers seeking to admit workers under the H-2B program to first "apply for a temporary labor certification with the Secretary of Labor," which certification "shall be advice to the director [of DHS] on whether or not United States workers capable of performing the temporary services or labor are available and whether or not the alien's employment will adversely affect the wages and working conditions of similarly employed United States workers." 8 C.F.R. § 214.2(h)(6)(iii)(A). Thus, because "there is adequate indication of congressional intent in the statute to demonstrate substantial delegation of authority to the [DHS]," *Robert Wood Johnson Univ. Hosp. v. Thompson*, 297 F.3d 273, 281 (3d Cir. 2002), and because the DHS promulgated regulation 214.2 pursuant to that authority, "*Chevron* and its progeny provide the applicable standard of review." *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 191 (D.C. Cir. 1993).

2.

"*Chevron* established a familiar two-step procedure for evaluating whether an agency's interpretation of a statute is lawful." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005). The Supreme Court has

31

instructed that "[a]t the first step, we ask whether the statute's plain terms 'directly addres[s] the precise question at issue.'" *Id.* (quoting *Chevron*, 467 U.S. at 843). "If the statute is ambiguous on the point, we defer at step two to the agency's interpretation so long as the construction is 'a reasonable policy choice for the agency to make.'" *Id.* (quoting *Chevron*, 467 U.S. at 845).

a.

At the first step, the Supreme Court has instructed that we must consider not only the plain language of the statute, but also, through "traditional tools of statutory construction," whether "Congress had an intention on the precise question at issue." *Chevron*, 467 U.S. at 843 n.9. Section 1184(c) is silent as to the identity of the agencies with which the DHS may consult in fulfilling its charge to "determine[] . . . [t]he question of importing any alien as a nonimmigrant under [the H-2B program]." 8 U.S.C. § 1184(c)(1). The statute likewise does not "directly addres[s] the precise question" of what constitutes permissible consultation. *Nat'l Cable*, 545 U.S. at 986 (quoting *Chevron*, 467 U.S. at 843); *see* 8 U.S.C. § 1101 (prescribing definitions for the INA and providing no definition for "consultation"). We observe that, unlike in the context of the H-2A program, Congress did not specify the agency or agencies with which the DHS should consult in determining H-2B petitions. *Compare* 8 U.S.C. § 1101(a)(15)(H)(ii)(a), *with id.* § 1101(a)(15)(H)(ii)(b); *see also id.* § 1184(c)(1). "[T]hat silence suggests . . . that the [DHS] has the discretion to fill the consequent statutory gap." *Nat'l Cable*, 546 U.S. at 997. We cannot glean any more understanding of Congress' intention with respect to either question from the plain language of the statute read through "traditional tools of statutory construction." *Chevron*, 467

32

U.S. at 843 n.9; *see United States v. Geiser*, 527 F.3d 288, 293 (3d Cir. 2008) ("[W]e no longer find it necessary to consider legislative history at *Chevron* step one."). Accordingly, we conclude that the first step of the *Chevron* inquiry is satisfied.

b.

We next consider whether the DHS's construction of the INA is permissible, that is, whether it was "'a reasonable policy choice for the agency to make.'" *Nat'l Cable*, 545 U.S. at 986 (quoting *Chevron*, 467 U.S. at 845). We find that it is.

We begin with Appellants' contention that the DHS impermissibly interpreted the INA as allowing it to subdelegate its authority to administer the H-2B program to the DOL. The precise question presented by this case is one of *sub*delegation, *i.e.*, the transfer of authority from an agency endowed with authority pursuant to congressional enactment to entities within or outside of the agency itself. As a general rule, "[w]hen a statute delegates authority to a federal officer or agency, subdelegation to a subordinate federal officer or agency is presumptively permissible absent affirmative evidence of a contrary congressional intent." *U.S. Telecom Ass'n*, 359 F.3d at 565. Our sister Courts of Appeals have recognized, however, "an important distinction between subdelegation to a *subordinate* and subdelegation to an *outside party*," finding that "subdelegations to outside parties are assumed to be improper absent an affirmative showing of congressional authorization."[15]  *Id.*; *see also Fund for*

---

[15]     Although the case law strongly suggests that the presumption of authority to subdelegate is inapplicable where

33

*Animals v. Kempthorne*, 538 F.3d 124, 132 (2d Cir. 2008) ("We agree with the D.C. Circuit that, absent statutory authorization, such delegation is impermissible.").[16] Under this line of reasoning, then, a subdelegation of authority from the DHS to the DOL—an outside, non-subordinate agency— would be impermissible absent a clear statement from Congress authorizing such.

But the prohibition against subdelegation to an outside entity in the absence of express congressional authorization is applicable only if an agency actually delegated its power in the first place. Thus, as a threshold matter, we must determine whether any delegation occurred at all. "An agency delegates its authority when it shifts to another party almost the entire determination of whether a specific statutory requirement . . . has been satisfied, or where the agency abdicates its final reviewing authority." *Kempthorne*, 538 F.3d at 133 (citations and internal quotation marks omitted).

---

an agency has attempted to delegate to a non-subordinate or outside entity, we need not decide this question today because, as discussed *infra*, the DHS's actions were not, by definition, a delegation of authority.

[16] As the D.C. Circuit has succinctly explained, "subdelegation to outside entities aggravates the risk of policy drift inherent in any principal-agent relationship" by blurring "lines of accountability"; "undermining an important democratic check on government decision-making"; and "increas[ing] the risk that these parties will not share the agency's national vision and perspective." *U.S. Telecom Ass'n*, 359 F.3d at 565–66 (internal quotation marks omitted).

In the case at bar, the authority delegated by Congress to the DHS under the INA "bears little resemblance to the far narrower band of discretion afforded to" the DOL under regulation 214.2. *Id.* The INA provides for the admission of aliens who have no intention of abandoning their foreign residence and intend to enter the United States to perform temporary work "if unemployed persons capable of performing such service or labor cannot be found in this country . . . ." 8 U.S.C. § 1101(a)(15(H)(ii)(b). Congress has charged the DHS with administering the INA and "determin[ing] . . . [t]he question of importing any alien as a nonimmigrant under [the H2-B program] . . . after consultation with appropriate agencies of the Government, upon petition of the importing employer." *Id.* § 1184(a), (c)(1). Regulation 214.2, by contrast, requires employers seeking to admit workers under the H-2B program to first "apply for a temporary labor certification with the Secretary of Labor," which "certification shall be advice to the director [of the DHS] on whether or not United States workers capable of performing the temporary services or labor are available and whether or not the alien's employment will adversely affect the wages and working conditions of similarly employed United States workers." 8 C.F.R. § 214.2(h)(6)(iii)(A). Although the DHS's decision to grant an H-2B petition depends, in part, on whether or not the DOL issues a temporary labor certification to the petitioner-employer, it is the DHS—not the DOL—that must determine whether the other criteria for an H-2B visa have been satisfied. For example, even if the DOL issues an employer a temporary labor certification, the DHS must still determine whether the alien intends to remain in the United States on a temporary basis and not abandon his or her foreign residence. *See* 8 U.S.C. § 101(a)(15)(H)(ii)(b); 2008 Wage Rule, 73 Fed.

35

Reg. at 78, 115 (explaining that after the DOL issues a temporary labor certification, "DHS reviews all of the necessary documentation that is required to be submitted with the petition," and "may examine elements that are presented not only on the petition, but on the temporary labor certification as well for consistency such as stated wages, the nature of the job offered, the location, and other factors common to both petition and temporary labor certification"). Moreover, it is ultimately within the DHS's discretion to grant or deny H-2B visa petitions after assessing whether the above-described requirements have been satisfied. *See* 8 U.S.C. § 1184(c)(1); *see also* 2008 Wage Rule, 73 Fed. Reg. at 78,115 ("While DHS will not go into the merits of the determination previously made by DOL, DHS is responsible for ensuring the integrity of the H-2B program, that the facts presented in the entire petition package are true and verifiable.").

Regulation 214.2 therefore does not effect a delegation of authority, but instead provides for a type of "legitimate outside party input into agency decision-making processes." *U.S. Telecom Ass'n*, 359 F.3d at 566. Our sister Courts of Appeals have recognized three such types of permissible assistance: "(1) establishing a reasonable condition for granting federal approval; (2) fact gathering; and (3) advice giving." *Id.* The scheme established under regulation 214.2 fits the first of these models. By adopting a rule that requires H-2B employers to first obtain a temporary labor certification from the DOL on the questions of whether there are U.S. workers capable of performing the job in question and the impact of the aliens' employment on U.S. workers, and giving the DOL discretion to issue a limited set of rules governing the certification process, the DHS was exercising

36

its broad authority to "determine" the specific "question of importing any alien" under the H-2B visa program. 8 U.S.C. §1184(a), (c). The DHS thus did not impermissibly subdelegate all of its authority in this area. Rather, the DHS *conditioned* its own granting of an H-2B petition on the DOL's grant of a temporary labor certification.

Where Congress has entrusted a federal agency with broad discretion to permit or forbid certain activities, we will uphold the agency's conditioning of its "grant of permission on the decision of another entity, such as a state, local, or tribal government, so long as there is a reasonable connection between the outside agency's decision and the federal agency's determination." *U.S. Telecom Ass'n*, 359 F.3d at 567. Here, Congress has charged the DHS with determining whether or not to grant H-2B visa petitions. *See* 8 U.S.C. §§ 1101(a)(15)(H)(ii)(b), 1184(c). As part of that determination, the DHS must consider whether there are United States citizens willing to perform the job for which an H-2B visa is sought. *See id.* § 1101(a)(15)(H)(ii)(b). The DHS has been further instructed pursuant to section 1184(c) of the INA to "consult[]" with "appropriate agencies of the Government" in making H-2B visa determinations. *Id.* § 1184(c)(1). The INA does not define what constitutes "consultation," nor does it specify the agencies with which the DHS may (or may not) consult in administering the H-2B program. *See id.* §§ 1101, 1184(c)(1).

We find that there is a "reasonable connection" between the DHS's determination of H-2B petitions and the DOL's decisions on temporary labor certifications in light of the statute's silence as to what constitutes permissible "consultation" and the specific agencies with which the DHS may consult in making H-2B visa determinations. *U.S.*

*Telecom Ass'n*, 359 F.3d at 567. This is especially so in consideration of the DOL's institutional expertise in labor and employment matters, as well as the Department's history of rulemaking authority in the context of the H-2B program. The DOL has been involved in the administration of the nation's immigration laws since its inception in 1913, and for the past six decades, has provided temporary labor certifications in some form to the government agency charged with administering the nation's immigration laws concerning admission of temporary non-agricultural workers. *See La. Forestry Ass'n*, 889 F. Supp. 2d at 716 n.2. Beginning in the 1960s, the DOL provided certifications to INS at INS's request. *See* 31 Fed. Reg. at 4,446 (INS regulation requiring H-2B petitioners to first obtain a "certification from the Secretary of Labor . . . stating that qualified persons in the United States are not available . . . ."); 31 Fed. Reg. at 11,744 (same); 33 Fed. Reg. at 7,570 (1968 DOL regulation governing the certification process); 43 Fed. Reg. at 10,306 (1978 regulation concerning the same); Gen. Admin. Ltr., No. 4-95; Gen. Admin. Ltr., No. 2-98. In 2002, when authority to administer the INA was transferred to the DHS, the DOL continued its role of providing temporary labor certifications and advice about the availability of U.S. workers for H-2B jobs and the effect of H-2B workers' employment on U.S. workers' wages. *See La. Forestry Ass'n*, 889 F. Supp. 2d at 717; 2008 Wage Rule, 73 Fed. Reg. at 78,020.

It was likewise reasonable for the DHS to adopt a regulatory provision allowing the DOL to promulgate a narrow class of rules governing the temporary labor certification process. Without the ability to establish procedures to administer the temporary labor certification process, the DOL would not be able to fulfill the consulting

role defined by DHS's charge to the DOL to issue temporary labor certifications. The DHS afforded DOL only as much rulemaking authority as needed to carry out its consultative role by issuing temporary labor certifications. Furthermore, as noted above, the DOL has institutional expertise in matters concerning U.S. employment, and a long and extensive history of issuing temporary labor certifications for non-agricultural jobs and making limited rules to structure the issuance of such certifications. Thus, there is a "reasonable connection" between the DOL's limited rulemaking authority and the DHS's determination of H-2B visa petitions. *U.S. Telecom. Ass'n*, 359 F.3d at 567.

We further note that Congress is and has been aware of the DOL's involvement in the administration of the H-2B visa program for several decades, and yet, despite several opportunities to do so, has never amended the INA to prohibit the DOL's involvement in the H-2B program or to specify which agencies are the "appropriate" ones with which the DHS may consult in exercising its authority to grant or deny H-2B visas. For example, when it bifurcated the H-2 program to create the H-2A and H-2B programs, Congress specifically named the DOL as the agency with which the DHS must consult in administering the H-2A program. *See* IRCA § 301(b) ("8 U.S.C. § 1184(c) is amended by adding at the end of the following: 'For purposes of this subsection with respect to nonimmigrants described in section 101(a)(14)(H)(ii)(a), the term 'appropriate agencies of Government' means the Department of Labor . . . .'"). However, Congress was silent as to which agencies, specifically, the DHS may "consult[]" with in its administration of the H-2B program, choosing broad language—"appropriate agencies," 8 U.S.C. § 1184(c)—and

39

thus affording the DHS greater discretion with respect to the agencies with which it may consult concerning the H-2B program. *See Addison v. Holly Hill Fruit Products*, 322 U.S. 607, 616 (1944) ("[W]hen Congress wants to give wide discretion it uses broad language.").

Nor did Congress enact any changes to the H-2B program after the Supreme Court's decision in *Alfred L. Snapp & Son, Inc., v. Puerto Rico*, 458 U.S. 592 (1982), where the Court recognized that the DOL promulgates rules concerning the H-2B program, despite enacting amendments to the INA in both 2005 and 2011. "The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific." *Midatlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 501 (1986). If, in fact, Congress did not intend to allow the DHS to consult with the DOL in this manner when it enacted section 1184(c)(1), then Congress may amend the INA accordingly. Where, however, an agency reasonably construes a statute endowing it with broad authority, we must defer to that interpretation, and "the remedy, if any is indicated, is for congressional, and not judicial, action." *Flood v. Kuhn*, 407 U.S. 258, 285 (1972).

We thus reject Appellants' contention that the 2011 Wage Rule was promulgated pursuant to an unlawful subdelegation of the DHS's authority to administer the H-2B program. We hold, instead, that the 2011 Wage Rule was issued pursuant to the DHS's permissible "conditioning" of the grant of H-2B petitions on the advice of the DOL pursuant to the DHS's charge from Congress to "determine[]" H-2B visa petitions "after consultation with appropriate agencies of the Government." 8 U.S.C. § 1184(c)(1). Because we find

that the 2011 Wage Rule was promulgated pursuant to a permissible conditioning of the DHS's granting of H-2B petitions on a decision by the DOL and the limited rulemaking authority the DOL has to carry out that charge, we need not decide today whether, as the Departments contend and Appellants vigorously contest, the DOL has express or implied statutory authority under the WPA or INA to promulgate rules concerning the H-2B program. *See Taylor v. Peoples Natural Gas Co.*, 49 F.3d 982, 992 (3d Cir. 1995) ("It is well settled law that in general [c]ases are to be decided on the narrowest legal grounds available, and relief is to be tailored carefully to the nature of the dispute before the court.") (quotation marks omitted). We leave that question, which remains open in this Circuit, for another day, and hold only that the 2011 Wage Rule was lawfully promulgated pursuant to a reasonable interpretation of a statutory provision charging the DHS with administration of the H-2B program. *See* 8 U.S.C. § 1184. Our decision is completed by the principles of deference governing our review on appeal.[17] *See*

---

[17] We acknowledge that the decision we reach today is a difficult one, especially because the result we reach may potentially create a split between our Court and the Eleventh Circuit. In a recent review of a preliminary injunction of the 2011 Wage Rule, the Eleventh Circuit rejected the DOL's argument that it has rulemaking authority in the context of the H-2B program pursuant to a lawful conditioning by DHS of its authority to grant or deny H-2B visa petitions. *See Bayou Lawn & Landscape Servs. v. Sec. of Labor*, 713 F.3d 1080 (11th Cir. 2013).

Our decision in this case is "influence[d] by the policy consideration that circuit splits, especially in the circumstance

41

of this case in which national uniformity of a single rule is of vital importance, are to be avoided." *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 929 n.16 (5th Cir. 1997). We thus emphasize that under the governing standards of review, and in consideration of the important principles of separation of powers that guide our review of agency action, we feel bound to defer to the DHS's interpretation of the statutes under which Congress has authorized it to administer the H-2B program. *See Chevron*, 467 U.S. at 845. We reiterate that should Congress disagree with this construction of the INA, Congress may take action to amend the statute accordingly. We further note that the procedural posture of *Bayou*—an appeal from the grant of a preliminary injunction, rather than from a final judgment—means that the *Bayou* Court's decision is not the final word from the Eleventh Circuit on the question of the DOL's general rulemaking authority. The three-member panel in *Bayou* opined only on whether the District Court abused its discretion in finding that the employer-plaintiffs were likely to succeed on the merits of their challenge to the DOL's rulemaking authority, not on whether the DOL actually has that authority or not. *See Bayou*, 713 F.3d at 1085; *Pitt News v. Pappert*, 379 F.3d 96, 104 (3d Cir. 2004) ("[I]t is well established that . . . a panel hearing an appeal from the entry of a final judgment [is not required] to follow the legal analysis contained in a prior panel decision addressing the question of whether a party that moved for preliminary injunctive relief showed a likelihood of success on the merits."). A circuit split is thus not yet a foregone conclusion.

*Linmark Assocs., Inc. v. Willingboro Twp.*, 431 U.S. 85, 98 (1977).

B.

Having determined that the DOL has authority to engage in rulemaking concerning the H-2B program, we turn to Appellants' argument that even if the DOL has general rulemaking authority, it exceeded that authority when issuing the 2011 Wage Rule. Appellants present several procedural and substantive challenges under the APA and INA, respectively. We address each in turn.

1.

The 2011 Wage Rule was promulgated pursuant to the informal rulemaking procedures of section 553 of the APA. *See* 5 U.S.C. § 553. "The agency's action in promulgating such standards therefore may be set aside if found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm. Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983) (quoting 5 U.S.C. § 706(2)(A)). "A court may conclude that a regulation is arbitrary and capricious only if the agency relied on facts other than those intended by Congress, did not consider an important aspect of the issue confronting the agency, provided an explanation for its decision which runs counter to the evidence before the agency, or is entirely implausible." *Gardner v. Grandolsky*, 585 F.3d 786, 790 (3d Cir. 2009) (quotation marks omitted). Although our "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416

43

(1971). We are "not empowered to substitute [our] judgment for that of the agency." *Id.*

a.

Appellants first argue that the DOL failed to comply with section 553 of the APA, which requires that an agency publish general notice of a proposed rule in the Federal Register and include in that notice "reference to the legal authority under which the rule is proposed," and "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(2)&(3). The purpose of "[s]ection 553 [is] . . . to give the public an opportunity to participate in the rulemaking process," and to "enable[] the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated." *Am. Iron & Steel Inst. v. EPA*, 568 F.2d 284, 291 (3d Cir. 1977). Thus, in evaluating an argument that an agency failed to satisfy the requirements of section 553, we ultimately "must determine whether the notice given was sufficient to fairly apprise interested parties of all significant subjects and issues involved." *Id.* (quotation marks omitted).

We disagree with Appellants that the DOL failed to adequately explain the legal basis for, or purpose of, the 2011 Wage Rule. The DOL expressly identified 8 C.F.R. § 214.2(h)(6) as "the legal basis for the proposed rule" in a section of the NPRM entitled "Succinct Statement of the Objectives of, and Legal Basis for, the Proposed Rule." Proposed 2011 Wage Rule, 75 Fed. Reg. at 61,584. Furthermore, as the District Court correctly observed, the DOL also identified sections 1101(a)(15)(H)(ii)(B) and 1184(c)(1) of the INA as bases for its authority to issue the

44

2011 Wage Rule.[18] In the NPRM, the DOL explained that the DHS is charged with administering the H-2B program pursuant to section 1101(a)(15)(H)(ii)(b) of the INA, and that

> [s]ection 214(c)(1) of the INA requires DHS to consult with appropriate agencies before approving an H-2B visa petition. The regulations [8 C.F.R. § 214.2(h)(6)] for U.S. Citizenship and Immigration Services (USCIS), the agency within DHS which adjudicates requests for H-2B status, require that an intending employer first apply for a temporary labor certification from the Secretary of Labor.

*Id.* at 61,578. The DOL also thoroughly explained the need for the 2011 Wage Rule and identified the purpose of the Rule. In a subsection entitled "The Need for New Rulemaking," the DOL explained:

> [T]he Department ha[d] grown increasingly concerned that the current calculation method does

---

[18] The fact that the DOL identified these provisions of the INA as bases for the 2011 Wage Rule in a separate section of the NPRM from that in which it cited regulation 214.2 is of no import, as "[t]he APA does not require that the proposed rule cite the relevant legal authority in a certain location." *United States v. Stevenson*, 676 F.3d 557, 563 (6th Cir. 2012).

not adequately reflect the appropriate wage necessary to ensure U.S. workers are not adversely affected by the employment of H-2b workers. Additionally, the prevailing wage calculation methodology became the subject of litigation. . . . Accordingly, in order to comply with the Court's order and to appropriately establish a wage methodology that adequately protects U.S. and H-2B workers, the Department is engaging in this new rulemaking . . . .

*Id.* at 61,579; *see also* 75 Fed. Reg. at 61,584 (subsection entitled "Description of the Reasons That Action by the Agency Is Being Considered"). These statements "would fairly apprise interested persons of the subjects and issues before the [DOL]," and, more specifically, of the legal basis and purpose of the proposed rule. *Am. Iron & Steel Inst.*, 568 F.2d at 293. Accordingly, we agree with the District Court that the DOL "provided sufficiently detailed notice to the public of the DOL's authority" as required by section 553(b). *La. Forestry Ass'n*, 889 F. Supp. 2d at 732.

b.

Appellants next argue that the DOL failed to consider employer interests or hardship and improperly established wages to attract U.S. workers in promulgating the 2011 Wage Rule. Appellants further contend that the DOL failed to provide an adequate "reasoned analysis" in support of the

46

Rule. Appellants' Br. at 65. Failure to consider relevant factors or provide an adequate explanation for an agency action are indeed among the "wide range of reasons why agency action may be judicially branded as 'arbitrary and capricious.'" *FEC v. Rose*, 806 F.2d 1081, 1088 (D.C. Cir. 1986). We find, however, that the DOL satisfied both of these requirements, "neither [of which] is particularly demanding." *Pub. Citizen*, 988 F.2d at 197.

First, as to the requirement that an agency consider factors relevant to the rule in question, the APA requires only that an agency "demonstrate that it has considered the relevant factors brought to its attention by interested parties during the course of the rulemaking, and that it has made a reasoned choice among the various alternatives presented." *Nat'l Indus. Sand Ass'n v. Marshall*, 601 F.2d 689, 700 (3d Cir. 1979). The DOL did so in this case. With respect to employer interests and hardship, the DOL considered the effect of the 2011 Wage Rule's wage methodology on employers, namely, that it would potentially result in employers experiencing higher-than-anticipated labor costs. *See* 2011 Wage Rule, 76 Fed. Reg. at 3,462. Directly in response to comments expressing concern that "the Department did not take into account contracts employers have already put in place for the coming year," the DOL concluded that "[t]he fact that a new wage methodology may result in wages in excess of anticipated labor costs does not minimize the Department's obligation" to provide for calculation of a prevailing wage rate that does not have an adverse impact on the wages of similarly-employed U.S. workers. *Id.* In any event, the DOL is not required to consider employer hardship under the statutory and regulatory framework from which its authority to issue labor

47

certifications derives. The DOL must, instead, balance the interests of "assur[ing] an adequate labor force on the one hand and . . . protect[ing] the jobs of citizens on the other."[19] *Rogers*, 563 F.2d at 626; *see* 8 U.S.C. § 1101(a)(15)(H)(ii)(b); 8 C.F.R. § 214.2(h)(6)(iii)(A); *see also Snapp*, 458 U.S. at 596. The DOL satisfied its obligations under the APA by "respond[ing] to relevant and significant public comments" concerning factors relevant to the 2011 Wage Rule and "adequately explaining its result." *Pub. Citizen*, 988 F.2d at 197.

We likewise reject Appellants' argument that the DOL improperly established wage rates in order to attract U.S. workers—a factor Appellants claim the DOL was prohibited from considering in promulgating the 2011 Wage Rule. According to Appellants, in the NPRM and notice accompanying the final rule, the DOL "discussed the effect of higher wage rates on employers' ability to attract U.S. workers," a "factor that Congress and the [DHS] precluded from consideration." Appellants' Br. at 60–61. We cannot agree. The INA and DHS regulatory provisions governing the DOL's issuance of labor certifications *require* the DOL to consider, in issuing a temporary labor certification, whether H-2B alien workers' employment "will adversely affect the

---

[19] Indeed, the District Court in the *CATA* litigation expressly found that the DOL was *prohibited* from considering employer hardship in setting the prevailing wage rate. *See CATA II*, 2011 WL 2414555, at \*4. One may well question that conclusion, since an employer's hardship can certainly be relevant to the goal of protecting citizens' jobs, but that issue is not before us in this appeal and we thus express no further comment on the propriety of that holding.

wages and working conditions of similarly employed United States workers," 8 C.F.R. 214.2(h)(6)(iii), a requirement that derives from the DHS's charge from Congress to consider whether H-2B workers will have an "adverse effect" on U.S. workers. 8 U.S.C. §§ 1101(a)(15)(H)(ii)(b), 1184(c)(1). The DOL's statements concerning the proposed methodology's potential to "attract" U.S. workers to which Appellants object were made in the course of its discussion of whether the proposed wage methodology would "adversely affect[] the wages of U.S. workers in those same jobs," and in the Department's economic analysis of the effect of the Rule—an analysis required by Executive Order 12866. *See* Proposed 2011 Wage Rule, 75 Fed. Reg. 61,581 n.3; 2011 Wage Rule, 76 Fed. Reg. at 3,454; 75 Fed. Reg. at 61,583; 76 Fed. Reg. 3,470. Thus it was neither arbitrary nor capricious for the DOL to include in the NPRM and final rule an analysis and discussion of the effects that the 2011 Wage Rule's wage calculation methodology might have on U.S. workers.

We likewise hold that the DOL provided the "reasoned analysis supported by the evidence" required by the APA. *Prometheus Radio Project v. FCC*, 652 F.3d 431, 462 (3d Cir. 2011). Appellants' challenge to the DOL's compliance with this requirement focuses on the DOL's purported failure to respond to public comments "criti[cizing] DOL for adopting diverse wage data sources and urg[ing] DOL to 'show its work' to corroborate that the various methodologies were mutually validating . . . ." Appellants' Br. at 66. Appellants also take issue with the DOL's purported disregard of public comments "urg[ing] DOL to make a more expansive view [of] . . . adverse impact on other American co-workers." *Id.* at 67.

49

It is well established, however, that an "agency need not address every comment" it receives. *City of Waukesha v. EPA*, 320 F.3d 228, 257 (D.C. Cir. 2003). The APA requires only that the NPRM show the court "what major issues of policy were ventilated by the informal procedures and why the agency reacted to them as it did." *Auto. Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968). The DOL responded to comments concerning a variety of topics related to the Proposed 2011 Wage Rule, devoting an entire section of the final rule to discussing the 300 comments submitted. *See* 2011 Wage Rule, 76 Fed. Reg. at 3,454–3,468. For example, the DOL responded to comments concerning the ability of employers to find U.S. workers interested in H-2B job opportunities; the propriety of the wage methodology adopted, including use of SCA or DBA wage data and the elimination of the four-tier wage method; and the alleged error in the data the Department used to measure the effect of the H-2B wage methodology on wages. *See id.* at 3,454–3,463. The DOL also discussed comments proposing alternative methods for calculating the prevailing wage rule and explained why it rejected these alternatives. *See id.* at 3,463–3,468. In responding to the comments, and in the discussion portion of the notice accompanying the final rule, the DOL "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *see* 2011 Wage Rule, 76 Fed. Reg. at 3,452–3,468. This is all that the APA requires.

Accordingly, the DOL did not act arbitrarily and capriciously in contravention of the procedural requirements

of the APA, and the 2011 Wage Rule is not invalid on that ground.

2.

Finally, we turn to Appellants' substantive challenge to the 2011 Wage Rule. Appellants contend that section 1182(p)(4) of the INA required the DOL to use the four-tier wage methodology from the H-1B program as the prevailing wage calculation mechanism in the H-2B program and erred by eliminating the four-tier structure from the wage calculation regime. Under section 706 of the APA, we must set aside an agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). This inquiry "necessarily entails a firsthand judicial comparison of the claimed excessive action with the pertinent statutory authority." *W. Union Tel. Co. v. FCC*, 541 F.2d 346, 354 (3d Cir. 1976).

Section 1182(p)(4) provides:

> Where the Secretary of Labor uses, or makes available to employers, a governmental survey to determine the prevailing wage, such survey shall provide at least 4 levels of wages commensurate with experience, education, and the level of supervision. Where an existing government survey has only 2 levels, 2 intermediate levels may be created by dividing by 3, the difference between the 2 levels offered, adding the quotient

51

> thus obtained to the first level and
> subtracting that quotient from the
> second level.

8 U.S.C. § 1182(p)(4) (2012). We acknowledge that this statement, taken alone and out of context, suggests that the four-tier methodology should be used in making prevailing wage determinations. But therein lies the problem with Appellants' argument: it is taken entirely out of context, with no reference to the section or subsection within which it is was enacted. Indeed, it is axiomatic that "the proper reading of a statute must take account of words in the context of the entire statute." *United States v. Atiyeh*, 402 F.3d 354, 366 (3d Cir. 2005); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.").

We therefore turn to the statutory context of section 1182(p)(4), which was enacted as part of the Consolidated Appropriations Act of 2005, and, more specifically, pursuant to the Title IV, "Visa Reform," sub-section 423, the "L-1 Visa and H-1B Visa Reform Act." *See* Pub. L. No. 108-447, div. J., tit. IV, § 423, 118 Stat. 2809, 3353–54 (2004). The short title of the section under which section 1182(p)(4) was enacted is "H-1B Prevailing Wage Level." *Id.* Indeed, as its title would suggest, the L-1 Visa and H-1B Visa Reform Act amended only provisions of U.S. immigration statutes dealing with the L-1 and H-1B visa programs—the H-2B program is not mentioned once in the Act. *See generally id.* Read in this context, it is abundantly clear that section 1182(p)(4)'s requirement that the DOL use the four-tier methodology applies only to the H-1B program. We therefore conclude that the DOL did not act "in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right" in eliminating the four-tier scheme from the 2011 Wage Rule.[20] 5 U.S.C. § 706(2)(C). Accordingly, we reject Appellants' argument that the 2011 Wage Rule violates the requirements of the INA.[21]

---

[20] Because we find that the statute is unambiguous, we reject the Departments' and Intervenors' assertion that *Chevron* deference is warranted. *See Nat'l Cable*, 545 U.S. at 982 (noting that *Chevron* deference is warranted only if the court first finds that the statute is ambiguous).

[21] We likewise reject Appellants' argument that the DOL violated the APA when it issued the April 2011 NPRM in which it, among other things, modified the H-2B program certification form, finding, as the District Court did, that Appellants waived this argument. *See La. Forestry Ass'n*, 889 F. Supp. 2d at 737 n.19. We have carefully reviewed the record—taking steps to obtain a complete copy of the complaint, rather than the truncated version reproduced in the Joint Appendix—and conclude that the claim was raised for the first time only in pretrial memoranda and was not, as Appellants claim, "prominently stated in the Complaint." Appellants Br. at 61. *Compare* J.A. 407-24, *with* D.C. Docket, No. 1-11-cv-01623-DDD-JDK, No. 1 (W.D. La. Sept. 19, 2011). Indeed, the April 2011 notice, 76 Fed. Reg. 21,036, is not cited *one time* in the Complaint. *See* D.C. Docket, No. 1-11-cv-01623-DDD-JDK, No. 1. Nor did Appellants move to amend the Complaint to include a challenge to the April 2011 notice. Accordingly, the claim is waived. *See Josey v. John R. Hollingsworth Corp.*, 996 F.2d

III.

For the foregoing reasons, we affirm the judgment of the District Court.

---

632, 641-42 (3d Cir. 1993); *Zimmerman v. PepsiCo., Inc.*, 836 F.2d 173, 181 (3d Cir. 1988).