PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-3557
_____

COMITE´ DE APOYO A LOS TRABAJADORES AGRICOLAS;
PINEROS Y CAMPESINOS UNIDOS DEL NOROESTE;
NORTHWEST FOREST WORKER CENTER;
JESUS MARTIN SAUCEDA PINEDA;
JUAN DOE,

Appellants

v.

THOMAS E. PEREZ, In His Official Capacity as United
States Secretary of Labor; UNITED STATES
DEPARTMENT OF LABOR; ERIC M. SELEZNOW,
In His Official Capacity as Acting Assistant Secretary for
Employment and Training
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 2-14-cv-02657)
Honorable Legrome D. Davis, Jr., District Judge
_____

Argued October 23, 2014

BEFORE: FUENTES, GREENBERG, and
COWEN, <u>Circuit</u> <u>Judges</u>

(Filed: December 5, 2014)
_____

Sarah M. Classen
Centro de los Derechos del Migrante, Inc.
519 North Charles Street
Suite 260
Baltimore, MD 21201

Vanessa A. Coe
Gregory S. Schell
Florida Legal Services, Inc.
508 Lucerne Avenue
Lake Worth, FL 33460

D. Michael Dale
Northwest Workers' Justice Project
812 Southwest Washington
Suite 1100
Portland, OR 09205

Arthur N. Read
Friends of Farmworkers, Inc.
699 Ranstead Street
Suite 4
Philadelphia, PA 19106

Meredith B. Stewart

2

Southern Poverty Law Center
1055 Saint Charles Avenue
Suite 505
New Orleans, LA 70130

Edward J. Tuddenham (argued)
228 West 137th Street
New York, NY 10030

   Attorneys for Appellants

Stuart F. Delery
Assistant Attorney General
Glenn M. Girdharry
Senior Litigation Counsel
Geoffrey Forney (argued)
Senior Litigation Counsel
United States Department of Justice
Office of Immigration Litigation
Room 6223
450 5th Street, N.W.
Washington, DC 20530

   Attorneys for Appellees

_____

OPINION OF THE COURT
_____

GREENBERG, Circuit Judge.

3

## I. INTRODUCTION

This appeal is concerned with the ripeness doctrine, a constitutional mandate derived from Article III's requirement that federal courts hear only cases or controversies. U.S. Const., Art. III, § 2. The doctrine assists courts in avoiding the need to address speculative cases, in deferring to administrators with subject matter expertise, and in deciding cases on the basis of fully-developed records. The Supreme Court has explained that the question of whether a controversy is "ripe" for judicial resolution has two aspects that require a court to evaluate both the fitness of the issues for judicial decision and the possible hardship to the parties if it withholds consideration of a case presented to it. To some extent these inquiries require a court to exercise judgment, rather than to apply a black-letter rule. Abbott Labs. v. Gardner, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515 (1967).

In this case involving rules applying to the admission of certain foreign workers into the United States for temporary employment, we are mindful of the foregoing considerations and give due regard to the expertise exercised by the Department of Labor ("DOL"), the implicated agency principally involved in this case, and the historical shifts and political compromises underlying the DOL's adoption of the rules at issue. Furthermore, in view of the subject matter of this litigation, we are concerned with the congressional policy to protect American workers from a depression of their wages attributable to the entry of foreign workers into the domestic labor market.

Plaintiffs appeal from an order of the District Court dismissing their challenge to 20 C.F.R. § 655.10(f), a DOL

regulation applicable in the administration of the H-2B visa program that authorizes the Department of Homeland Security ("DHS") to admit certain unskilled foreign workers into this country for temporary employment. On this appeal, we are concerned with an aspect of the H-2B program, the 2009 Wage Guidance, which authorizes employers to use privately-funded wage surveys to set the prevailing market wage for certain occupations. The Court at the outset of its consideration of the case invoked the ripeness doctrine when it made a determination that the matter was not at that time justiciable and, accordingly, the Court would not consider the merits of plaintiffs' challenge to the regulation. Comité de Apoyo a Los Trabajadores Agricolas v. Perez, No. 14-2657, 2014 WL 4100708 (E.D. Pa. July 23, 2014) (CATA III). We determine that this case is ripe for judicial review, render judgment for plaintiffs, and hold that 20 C.F.R. § 655.10(f) and the 2009 Wage Guidance are arbitrary and capricious and in violation of the APA. We order vacatur of 20 C.F.R. § 655.10(f) and the 2009 Wage Guidance.[1]

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs based their complaint challenging 20 C.F.R. §

---

[1] The District Court dismissed without prejudice on justiciability grounds related litigation in Comité de Apoyo a Los Trabajadores Agricolas v. Perez, No. 13-7213, 2014 WL 3629528, ____ F. Supp. 2d ____ (E.D. Pa. July 23, 2014), a case in which the plaintiffs sought judicial review of certain actions, decisions, and rules in the administration of the H-2B program.

655.10(f) and DOL's 2009 Wage Guidance on the Administrative Procedure Act ("APA"). This case is another step in a long-running controversy concerning the administration of the H-2B program. Resolution of discrete disputes arising from the controversy have led to this Court and district courts setting out the factual background and procedural history of the controversy in previous opinions. See Comité de Apoyo a los Trabajadores Agrícolas v. Solis, No. 2:09-240 LP, 2010 WL 3437761 (E.D. Pa. Aug. 30, 2010) (CATA I); Comité de Apoyo a los Trabajadores Agrícolas v. Solis, 933 F. Supp. 2d 700 (E.D. Pa. 2013) (CATA II); La. Forestry Ass'n, Inc. v. Solis, 889 F. Supp. 2d 711 (E.D. Pa. 2012), aff'd sub nom. La. Forestry Ass'n Inc. v. Secretary, U.S. Dep't of Labor, 745 F.3d 653 (3d Cir. 2014). Thus, though the issues we now address are new, we are not writing on a blank slate.

A.      The H-2B Visa Program

The H-2B visa program—named for the statutory section which authorized its creation[2]— allows United States employers to arrange for the admission of foreign workers ("H-2B workers") into the United States to perform temporary unskilled non-agricultural work. The governing criteria of the program were established through a process requiring the accommodation of political interests; the program balances employers' temporary need for unskilled foreign workers against the need to protect United States workers' employment, salaries, and working conditions. In furtherance of these considerations, the Immigration and Nationality Act ("INA") authorizes the

---

[2] Immigration and Nationality Act, Pub. L. No. 82-414, § 101(a)(15)(H)(ii)(B), 66 Stat. 163, 168 (1952).

6

issuance of H-2B visas only in cases in which employers demonstrate that the employment of foreign workers admitted under the program will not adversely affect the wages and working conditions of United States workers. 8 U.S.C. §§ 1101(a)(15)(H)(ii), 1182 (a)(5)(A)(i)(I)-(II).

DHS and DOL currently administer the H-2B program. The INA confers broad authority on DHS to admit aliens into this country and to promulgate regulations governing the issuance of nonimmigrant visas. 8 U.S.C. § 1184(a)(1). The H-2B program establishes a method for the issuance of visas differing from the ordinary practice by which a person seeking to be admitted into the United States applies for a visa because under the H-2B program the putative employer, not the person seeking to be admitted, makes the application. Prior to filing an H-2B petition with DHS, an employer must obtain a temporary labor certification from the Secretary of Labor. 8 C.F.R. § 214.2(h)(6)(iii) (2011). That certification constitutes DOL's "advice" that DHS should grant the requested H-2B visa and must confirm that: (1) qualified workers are not available in the United States to perform the employment for which foreign workers are sought, and (2) the aliens' employment will not adversely affect wages and working conditions of similarly employed United States workers. 8 C.F.R. § 214.2(h)(6)(iii)(A), (iv)(A). DHS regulations provide for DOL to "establish procedures" for issuing labor certifications within these confines. 8 C.F.R. § 214.2(h)(6)(iii)(D). Inasmuch as the availability of workers is related to the wage offered for the employment because the higher the wage the greater the likelihood that domestic workers can be found for the employment, DOL issues labor certifications that certify that the

7

employment is not being filled by United States workers at the occupation's "prevailing wage." Labor Certification Process and Enforcement for Temporary Employment in Occupations Other Than Agriculture or Registered Nursing in the United States (H-2B Workers), and Other Technical Changes, 73 Fed. Reg. 78,020-01, 78,056 (Dec. 19, 2008) (codified at 20 C.F.R. § 655.10(b)(2)).

## B.    Calculation of Prevailing Wages

DOL through its H-2B procedures long has sought to avoid causing adverse effects on American workers' wages and working conditions from the admission of foreign workers by requiring H-2B employers to offer and pay at least the prevailing wage both to the H-2B workers and to the United States workers engaged for the employment opportunity. To facilitate compliance with this requirement, DOL has from time to time published specific guidelines governing the system by which it will determine the prevailing wage for the employment that an employer is seeking to fill with foreign workers.

Over the years, DOL has changed its method for calculating prevailing wages on several occasions, often without giving interested parties notice of its intent to make the changes or the opportunity to comment on the contemplated changes, and has made the changes without explanation. Initially, DOL advised state workforce agencies that became involved in the administration of the program to calculate a single prevailing wage for any given occupation in the area of intended

employment.[3]  In 1995, DOL altered its methodology to determine the level of prevailing wages by creating multiple prevailing wages for each H-2B occupation.  DOL initially divided each H-2B occupation into two skill levels—"entry level" ("Level I") or "experienced level" ("Level II")—and calculated a prevailing wage for each level.[4]  But in 2005, DOL went further in the "2005 Wage Guidance" and divided H-2B occupations into four skill and wage levels, "specialty occupations," borrowing from a system that Congress created to calculate prevailing wages for the separate H-1B program dealing with the admission of skilled workers.  The DOL effectuated these changes through guidance letters without public notice or seeking comment comparable to the procedure followed when rules are adopted in an APA formal rulemaking process.

Prior to 2005, DOL required the use of wage rates established on the basis of government programs such as those under the Service Contract Act ("SCA") or the Davis Bacon Act ("DBA"), but in March 2005, DOL changed its approach through the 2005 Wage Guidance, which, in the absence of a

---

[3] See Department of Labor, General Administration Letter (GAL) 10-84, "Procedures for Temporary Labor Certifications in Non Agricultural Occupations" (Apr. 23, 1984).

[4] See Department of Labor, "Interim Prevailing Wage Policy for Nonagricultural Immigration Programs" (May 18, 1995) available at http://wdr.doleta.gov/directives.

collective bargaining agreement ("CBA"), permitted the prevailing wage rate to be set using either private employer surveys or a Bureau of Labor Statistics Occupational Employment Statistics ("OES") survey. Subsequently, on December 19, 2008, DOL adopted the "2008 Wage Rule," which states: "the prevailing wage for labor certification purposes shall be the arithmetic mean . . . of the wages of workers similarly employed at the skill level in the area of intended employment." 73 Fed. Reg. 78,020, 78,056 (Dec. 18, 2008) (codified at 20 C.F.R. § 655.10(b)(2)) (emphasis added). By specifying that a given prevailing wage is set "at the skill level" for the intended employment, the 2008 Wage Rule directs DOL to divide each H-2B occupation into four separate skill levels and calculate a prevailing wage for each level. 20 C.F.R. § 655.10(b)(2). The 2008 Wage Rule requires that, in the absence of a CBA, prevailing wage rates are to be determined on the basis of either a private employer survey or data derived from an OES survey. DOL did not seek comments on the use of the four-level wage methodology for determining prevailing wages when promulgating the 2008 Wage Rule.

Even though DOL did not seek public comments on the use of this four-level methodology in the H-2B program prior to adopting these rules, interested parties submitted comments to it contending that use of "skill level" prevailing wages made no sense in the context of low-skill H-2B jobs and that their adoption resulted in wage depression. The comments also criticized DOL's decision to permit the use of employer surveys when valid OES wage data was available for setting a prevailing wage because employer surveys would be used to undercut wages that would have been based on OES surveys to the

10

detriment of both American and foreign H-2B workers. 73 Fed. Reg. at 78,031; A386-409 (Low Wage Worker Legal Network July 2008 comments ETA 2008-0002-0088). DOL did not respond to those comments, instead continuing to set skill-level OES wages and evaluate employer surveys submitted pursuant to these regulations using the later-adopted 2009 Wage Guidance.[5] The 2009 Wage Guidance established a methodology by which the OES survey data for an occupation would be manipulated mathematically to produce four different prevailing wages, one for each of four skill levels within an occupation.

C.     <u>Prelude to the Present Litigation</u>

Organizations representing H-2B and United States workers challenged 20 C.F.R. § 655.10(f) and the 2009 Wage Guidance in <u>CATA</u> I. These plaintiffs asserted that the vast majority of H-2B jobs were low-skilled occupations filled by laborers, housekeeping cleaners, and amusement park workers, or persons in similar low-skilled employment, and that the rules recognized artificial skill distinctions that allowed employers to bring foreign workers into the country for employment at wages substantially below the average wage for an occupation, to the detriment of United States workers.

---

[5] DOL republished the 2005 Wage Guidance in November 2009 as the 2009 Wage Guidance. <u>See</u> Employment and Training Administration, Prevailing Wage Determination Policy Guidance, Nonagricultural Immigration Programs (Nov. 2009), A135-70. The 2009 Wage Guidance never was subject to notice and comment.

11

On August 30, 2010, a district court in <u>CATA</u> I held that DOL improperly promulgated the "skill level" 2008 Wage Rule. The court reasoned:

> In the absence of any valid regulatory language authorizing the use of skill levels in determining the prevailing wage rate . . . the four-tier structure of skill levels set out in the guidance letters—which is entirely untethered from any other statutory or regulatory provisions, and which affirmatively creates the wages paid to H–2B workers—constitutes a legislative rule which must be subjected to notice and comment. It has not been so subjected and it . . . is therefore invalid.

2010 WL 3431761, at *19. In invalidating the words "at the skill level," the court stressed that "DOL has never explained its reasoning for using skill levels as part of H-2B prevailing wage determinations" and that the system never has been subject to notice and comment, as the APA requires. <u>Id.</u> at *19, 25.

The district court further found that DOL's errors in promulgating the 2008 Wage Rule were "serious" and of a magnitude that counseled in favor of vacating the rule. <u>Id.</u> at *25 ("[W]hile the use of skill levels in 20 C.F.R. § 655.10 is invalid for lack of a rational explanation, DOL's failure to provide an explanation for using skill levels in the H–2B program constitutes a recurring issue stretching over more than a decade, and DOL was, in the context of the 2009 rulemaking, presented with comments alleging fundamental problems with the use of skill levels in the H–2B program."). Nonetheless, in

12

view of the circumstance that the court was invalidating the rule due to DOL's procedural rather than substantive errors, it did not vacate the portion of the 2008 Wage Rule providing for skill-level methodology; instead, the court remanded the case to DOL and ordered it to promulgate a replacement rule within 120 days, pursuant to the APA's procedures for notice and comment. Id.

Pursuant to that order, DOL issued a notice of proposed rulemaking. This notice stated that the 2008 Wage Rule's skill-level methodology did not comply with DOL's regulatory and statutory mandate because the methodology did not produce "the appropriate wage necessary to ensure that U.S. workers are not adversely affected by the employment of H-2B workers." Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program, 75 Fed. Reg. 61,578-01, 61,579 (Oct. 5, 2010). Following notice and comment, DOL announced a revised prevailing wage rule in January 2011 ("the 2011 Wage Rule"). Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program, 76 Fed. Reg. 3452-0176 (Jan. 19, 2011). The 2011 Wage Rule prohibits use of private surveys except where an otherwise applicable OES survey does not provide any data for an occupation in a specific geographical location, or where the OES survey does not accurately represent the relevant job classification. Id. at 3467. The 2011 Wage Rule's preamble explains that the Rule was promulgated in response to findings that the 2008 Wage Rule "artificially lowers . . . wage[s] to a point that [they] no longer represent[ ] market-based wage[s] for the occupation." Id. at 3477. The preamble concludes: "continuing the current calculation methodology . . . does not provide adequate

13

protections to U.S. and H-2B workers," violating both the INA and DHS mandates. Id. at 3471, 3477. Though employer associations challenged the 2011 Wage Rule, we upheld the rule in Louisiana Forestry, 745 F.3d 653.

### D. Continued Use of Skill-level Definition of Prevailing Wage Leads to the Present Suit.

Notwithstanding the district court's 2010 order and the promulgation of the 2011 Wage Rule, DOL has continued to use 20 C.F.R. § 655.10(f) and the 2009 Wage Guidance, as it has postponed the 2011 Wage Rule's effective date on several occasions because the 2011 Wage Rule was subject to congressional appropriations riders precluding its implementation.[6] As a result, DOL continued to evaluate labor certificates using the 2008 skill-level definition of prevailing wage. Plaintiffs, no doubt frustrated by this course of events, returned to the district court, and, on March 21, 2013, that court

---

[6] See Consolidated and Further Continuing Appropriations Act, 2012, Pub. L. 112-55, 125 Stat. 552, Div. B, Title V § 546 (2011); Consolidated Appropriations Act, 2012, Pub. L. 112-74, 125 Stat. 786, Div. F, Title I § 110 (2011); Continuing Appropriations Resolution, 2013, H.J. Res. 117, 112th Cong., 126 Stat. 1313 (2012); Consolidated and Further Continuing Appropriations Act, 2013, Pub. L. 113-6, 127 Stat 198, Div. F, Title 5 (2013). But funds for the 2011 Wage Rule finally were authorized on January 17, 2014, just prior to our decision upholding the rule in Louisiana Forestry, 745 F.3d 653. See Consolidated Appropriation Act, 2014, Pub. L. 113-76, 128 Stat.51.

14

invalidated the skill-level definition of prevailing wage in CATA II, 933 F. Supp. 2d at 711-12.

DOL and DHS responded to CATA II by promulgating an Interim Final Wage Rule ("IFR") pursuant to the APA "good cause" exception to notice and comment rulemaking. 5 U.S.C. § 553(b)(B), (d)(3). The IFR eliminated the use of skill levels from the definition of prevailing wage, but continued the practice of allowing a prevailing wage to be set by use of either an OES or private wage survey.[7] 78 Fed. Reg. 24,047, 24,061 (Apr. 24, 2013) (codified at 20 C.F.R. § 655.10(b)(2) (2013)). We note that DOL allowed this unlimited use of private surveys despite its 2011 findings that such surveys are unreliable and should only be used in extraordinary circumstances.

The promulgation of the IFR caused DOL to abandon the use of the 2008 Wage Rule and 2009 Wage Guidance to derive four skill-level prevailing wages from the OES survey. Instead it set the OES prevailing wage at the mean wage for each occupation and area of employment. 78 Fed. Reg. at 24,053, 24,058-59. However, the IFR had no effect on DOL's use of private employer surveys in the calculation of prevailing wages as DOL continued to evaluate private surveys using the skill-

---

[7] The IFR defines the prevailing wage as "the arithmetic mean . . . of the wages of workers similarly employed in the area of intended employment. The wage component of the BLS Occupational Employment Statistics Survey (OES) shall be used to determine the arithmetic mean, unless the employer provides a survey acceptable to the OFLC under paragraph (f) of this section." 20 C.F.R. § 655.10(b)(2) (2013).

15

level definition of prevailing wage.

The IFR, however, was hardly DOL's last word on the H-2B prevailing wage matter, for on March 14, 2014, the Secretary of Labor and DOL notified the regulated community that DOL "intends to publish a notice of proposed rulemaking on the proper wage methodology for the H-2B program working off of the 2011 Wage Rule as a starting point." 2014 H-2B Notice, 79 Fed. Reg. at 14,450. DOL stated that it "will consolidate our current review of comments on the 2013 IFR with review of comments received on the new notice of proposed rulemaking, and will issue a final rule accordingly." Id. Nevertheless, we cannot be certain if the new rule will be promulgated, or, if promulgated, become effective, because, among other possible impediments, its implementation depends on the availability of congressional funding and Congress might withhold the funding as it has in the past with earlier DOL rules. Moreover, unless and until a new final rule becomes effective, DOL will continue to approve skill-level prevailing wages based on private wage surveys. See 78 Fed. Reg. at 24,054 n.13 (indicating intent to continue to evaluate private surveys using 2009 Wage Guidance).

Notwithstanding the March 14, 2014 notification, plaintiffs, facing an uncertain picture, on May 8, 2014, sued Thomas Perez in his official capacity as Secretary of Labor to challenge the lawfulness of the continued use of private wage surveys. Plaintiffs contend that the use of such private wage surveys violates the district court's order in CATA II, 933 F. Supp. 2d 700, and that the challenged rules are arbitrary and contrary to law and were adopted in excess of DOL's jurisdiction in violation of the APA. Plaintiffs then sought a

16

preliminary injunction enjoining use of the challenged rules and moved for summary judgment.

After a hearing on the motion for a preliminary injunction, the District Court in CATA III dismissed the case without prejudice on July 23, 2014, on the ground that the proposed 2014 or 2015 rule-making process could result in a prospective change of the rules at issue such that plaintiffs' challenge was not ripe for adjudication. Plaintiffs filed a timely notice of appeal, and sought our expedited consideration of the appeal. We granted that request and now decide the case.

## III. JURISDICTION

The District Court had jurisdiction over this APA case pursuant to 28 U.S.C. §§ 1331 and 1346, and we have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 even though the dismissal was without prejudice. See Lichoolas v. City of Lowell, 555 F.3d 10, 13 (1st Cir. 2009).

## IV. STANDARD OF REVIEW

Our review of the District Court's dismissal on ripeness grounds is plenary. See Taylor Inv., Ltd. v. Upper Darby Twp., 983 F.2d 1285, 1289 (3d Cir. 1993). We also review APA-based challenges on a de novo basis, "apply[ing] the applicable standard of review to the underlying agency decision." La. Forestry, 745 F.3d at 669 (citing Cyberworld Enter. Techs. Inc.

17

v. Napolitano, 602 F.3d 189, 195-96 (3d Cir. 2010)). In exercising our jurisdiction, we note that it is "generally appropriate" for an appellate court to reach the merits of an issue even if the district court has not done so, provided that, as here, "the factual record is developed and the issues provide purely legal questions upon which an appellate court exercises plenary review." Hudson United Bank v. LiTenda Mortg. Corp., 142 F.3d 151, 159 (3d Cir. 1998).

## V.  DISCUSSION

### A.      The District Court Erred in Finding This Case Not Ripe.

The District Court concluded that plaintiffs' challenge was not ripe for adjudication because it believed that DOL should be permitted to review and rule on issues involving labor certification, at least in the first instance, without intervention from the judiciary. Although we do not doubt that ordinarily DOL rather than a court should make administrative determinations of the type at issue here, the history of this case convinces us that we should intervene at this time because the fact that DOL plans to reconsider the appropriateness of the use of private wage surveys does not mean that plaintiffs' challenge is unripe. See Am. Paper Inst. v. EPA, 996 F.2d 346, 355 n.8 (D.C. Cir. 1993) (finding case ripe even though EPA was considering rulemaking which could moot case); Am. Petroleum Inst. v. EPA, 906 F.2d 729, 739-40 (D.C. Cir. 1990) (rejecting EPA argument that planned rulemaking rendered case unripe and noting "an agency always retains the power to revise a final

18

rule through additional rulemaking. If the possibility that amendments to a rule was sufficient to render an otherwise fit challenge unripe, review could be deferred indefinitely.").

As we have explained, courts require a case to be ripe to be adjudicated to avoid becoming entangled in premature adjudication. Abbott Labs., 387 U.S. at 148, 87 S.Ct. at 1515. With regard to administrative agency actions, considerations of ripeness reflect the need "to protect . . . agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Id. at 148-49, 87 S.Ct. at 1515. When deciding if a case is ripe for adjudication, a court must consider (1) the fitness of the issues for judicial decision and (2) the hardship to the parties from withholding judicial consideration. Id. When making a "fitness for review" determination, a court considers whether the issues presented are purely legal, and the degree to which the challenged action is final. A court must consider whether the claims involve uncertain and contingent events that may not occur as anticipated or may not occur at all. See Phil. Fed'n of Teachers v. Ridge, 150 F.3d 319, 323 (3d Cir. 1998). We have taken these considerations into account and now determine that it is appropriate to subject the issues presented here to judicial review at this time, and that further delay may cause plaintiffs to suffer unjustifiable hardship. Moreover, we are satisfied that plaintiffs are entitled to relief. Thus, we will reverse the order of July 23, 2014, grant relief, and remand the matter to the District Court for further proceedings.

1. This Case Is Fit for Judicial Resolution.

We are satisfied that DOL's wage determinations

predicated on private wage surveys are final agency actions. We come to this conclusion even though the District Court found that "DOL [has] not yet taken a final position – specifically here, as to whether prevailing wage determinations under 20 C.F.R. § 655.10(f) using the 2009 Wage Guidance are valid, enforceable, and the specific wage methodology to be used." CATA III, 2014 WL 4100708, at *8. Notwithstanding the District Court's view, it is uncontested that both 20 C.F.R. § 655.10(f) and the 2009 Wage Guidance have been in place for years, and DOL has been using them regularly when acting on labor certification applications.

DOL's use of the challenged rules distinguishes this proceeding from cases the District Court cited in its opinion as in those cases the agencies involved had not implemented the challenged rule. See Felmeister v. Office of Att'y Ethics, 856 F.2d 529, 535-37 (3d Cir. 1988) (challenge to attorney advertising rule not ripe where ethics committee had yet to interpret the rule and plaintiff had never submitted advertisement for approval); Wearly v. FTC, 616 F.2d 662, 666-68 (3d Cir. 1980) (challenge to subpoena not ripe where agency had not made a decision to enforce the subpoena); AT&T Corp. v. FCC, 369 F.3d 554 (D.C. Cir. 2004) (challenge not ripe because the FCC reserved judgment on whether safeguards were necessary and its policy remained undetermined). This case is different because DOL's ongoing use of 20 C.F.R. § 655.10(f) and 2009 Wage Guidance to approve private wage surveys demonstrates that DOL has taken a "final" position for the purposes of our ripeness determination. This finality is not undermined even though the present rules may not remain DOL's last position with regard to H-2B program rules. See

20

Philadelphia Fed'n, 150 F.3d at 323.

The use and effect of DOL's rules allowing private surveys in prevailing wage determinations make this case analogous to Center for Biological Diversity v. EPA, 722 F.3d 401 (D.C. Cir. 2013), a case in which the Court of Appeals for the District of Columbia Circuit rejected a ripeness argument seeking dismissal of a challenge to a temporary regulation the EPA had committed to replace by a date certain. The court found the case ripe because the issues were "purely legal" and "sufficiently final" and the challenged regulation was causing injury to the plaintiff. Id. at 408. Cobell v. Babbitt, 30 F. Supp. 2d 34 (D.D.C. 1998), is similarly instructive. In Cobell, the Department of the Interior argued that a challenge to individual Indian trust account (IIM) procedures was not ripe because the challenged procedures were interlocutory. Id. at 34. The court rejected that argument, stating:

> Although the defendants surely can, and by their own admission should, reform the IIM trust accounting system, the deficiencies of their present system do not defeat its review on the grounds of finality. The system chosen by the defendants is being used in the administration of the plaintiffs' accounts. The fact that the defendants have the power to change the system cannot render the present system they have chosen to be one interlocutory in nature.

Id. (emphasis added). The Cobell court emphasized that the Department was making ongoing use of the IIM system and that the plaintiffs had no choice but to have their accounts

21

administered under that system. The accounting system was thus "final" for the purposes of a ripeness determination, although it was interlocutory in the sense that it was subject to further evaluation. See also Am. Paper, 996 F.2d at 355 n.8.

The District Court also relied on National Treasury Employees Union v. United States, 101 F.3d 1423, 1431 (D.C. Cir. 1996), for the proposition that the Court would conserve judicial resources by delaying adjudication of the dispute until DOL had completed its review and rule-making procedures. National Treasury, however, is unpersuasive with respect to the matter before us. That case involved a challenge to the Line Item Veto Act, which, although signed into law, would not go into effect until the President submitted a balanced budget. Id. Because it was unclear whether this triggering event ever would occur and, if so, when, and application of the Act could not harm the plaintiffs until such time, the court concluded that it would be a waste of judicial resources for it to entertain the challenge. Id. at 1430. Here, in contrast to the situation in National Treasury, plaintiffs' harm is not contingent on some triggering event; DOL is using the challenged rules on an ongoing basis in the administration of the H-2B program. Accordingly, this case is presently fit for adjudication.

### 2.      Withholding Judicial Consideration Considerably Harms Plaintiffs.

The second prong of our ripeness analysis requires that we evaluate the hardship that may be imposed on the parties if the courts deny judicial review at this time, and determine whether the challenged action has a "direct and immediate" impact on the parties. See Abbott Labs., 387 U.S. at 152, 87

22

S.Ct. at 1517.

The DOL's evaluation of employer surveys using the skill-level provisions of 20 C.F.R. § 655.10(f) and the 2009 Wage Guidance is adversely affecting United States workers by forcing them to accept depressed wages or face being replaced by foreign H-2B workers.  Indeed, the District Court recognized that the workers were suffering this injury and noted that "Plaintiffs . . . will have every opportunity to participate in the new rulemaking planned for 2014-2015." CATA III, 2014 WL 4100708, at *10.  But the possibility that plaintiffs will be able to participate in some future rulemaking that may or may not lead to a change in the rules does not ameliorate the harm that DOL's current use of those rules is causing plaintiffs now.

DOL is not delaying or conditionally issuing its labor certifications during its internal deliberations; rather, it is using the directives of 20 C.F.R. § 655.10(f) and the 2009 Wage Guidance to issue certifications.  Thus, we are facing a different landscape than would have been the case if DOL suspended issuing certifications based on private surveys or only issued certifications conditioned on the employer's promise to make retroactive adjustments to the wages of the foreign workers taking into account the results of DOL's future rulemaking. See CATA I, 2010 WL 4823236, at *3 (DOL has authority to issue conditional certifications).  Instead, it argues that 20 C.F.R. § 655.10(f) and the 2009 Wage Guidance lack finality even though it is continuing to use them when issuing final labor certifications.

It seems clear that each time DOL uses the challenged rules to certify to DHS that an application using a private survey

23

wage "will not adversely affect U.S. workers" pursuant to 8 C.F.R. § 214.2(h)(6)(iv)(A), DOL is making a final economic determination as to both the validity of the survey and the economic effect of the survey wage.[8]  And despite some hedging by appellees during oral argument before us, it is evident that DOL's continuing issuance of labor certifications based on the

[8] DOL asks this Court to affirm the District Court's dismissal based on what DOL itself characterizes as an extension of the ripeness doctrine.  The only case DOL cites in support of its "extension" argument is American Petroleum Institute v. EPA, 683 F.3d 382 (D.C. Cir. 2012), a case in which a trade association of petroleum refineries petitioned for review of a 2008 EPA rule deregulating hazardous secondary material but not addressing "spent refinery catalysts."  The challenged rule stated that the decision not to deregulate spent refinery catalysts was "tentative" and that EPA would "address the catalysts in a separate proposed rulemaking." Id. at 386.  While the case was on appeal, the EPA issued a notice of proposed rulemaking which indicated that it intended to treat spent refinery catalysts the same as other hazardous secondary material. Id. at 388. The court found that the tentative 2008 rule was causing the plaintiffs little harm and held the appeal in abeyance pending the completion of the new rulemaking. Id. at 389-90.  We find the matter before us to be quite different.  Here, there is nothing "tentative" about the challenged rules; DOL has been using them since 2005 in making final determinations. Moreover, the ongoing, direct harm to the livelihood of United States workers attributable to use of the challenged regulations clearly distinguishes this case from American Petroleum.

24

skill-level provisions of 20 C.F.R. § 655.10(f) and the 2009 Wage Guidance is affecting United States workers' wages. Rather than pay non-skill-level OES wages required by the IFR and face an average 21% wage increase, more and more employers seek to exploit the lingering loophole in DOL's administration of the H-2B program. See 78 Fed. Reg. at 24,053, 24,058-59.

In the 12 months prior to the District Court's March 21, 2013 order and subsequent issuance of the IFR, applicants submitted only 49 surveys employing a private wage survey determination.[9] However, with the vacatur of the skill-level definition and DOL's use of the mean OES survey wage as the prevailing wage, employers have turned to employer surveys as a way to continue paying depressed skill-level wages: 1,559 employer surveys were approved in the nine-month period

---

[9] DOL publicly posts database summaries of prevailing wage determinations on its website at http://www.foreignlaborcert.doleta.gov/performancedata.cfm. In the year prior to the issuance of the IFR (April 2012 to March 2013) seafood industry related jobs in SOC Codes 51- 3022 (Meat, Poultry, and Fish Cutters and Trimmers), 53-7064 (Packers and Packagers, Hand), and 45-3011 (Fishers and Related Fishing Workers) constituted the only employer wage surveys accepted by DOL apart from those submitted in five cases for Ski/Snowboard Instructors under SOC Code 25-3021 (Self-Enrichment Education Teachers). Each of the seafood industry occupational codes are classified by DOL as occupations requiring little prior training or experience.

25

between July 1, 2013, and March 31, 2014 – an increase from the prior period of more than 31 times (3,182%); 21.1% of those prevailing wage determinations were certified at wages below the OES Skill Level I wage (that is, at a wage less than the average paid by the lowest paying third of employers in the OES survey), and 94.4% offered wages below the OES Skill Level II wage.[10]

DOL has found that these wage levels are causing wage depression among domestic workers. 76 Fed. Reg. at 3463. Perhaps the most vivid illustration of the detriment to workers such as those represented by plaintiffs is the significant expansion of the usage of employer wage surveys in the landscaping industry, which did not submit any employer wage surveys in the year prior to April 2013 despite being the industry employing the most H-2B employees.[11] In the nine-month

---

[10] That DOL will continue to approve skill level prevailing wages at these Skill Levels is apparent from the DOL quarterly update to its Office of Foreign Labor Certification (OFLC) Performance Data issued in mid-April. See: http://www.foreignlaborcert.doleta.gov/performancedata.cfm; http://www.foreignlaborcert.doleta.gov/docs/py2014q2/PWD_FY14_Q2.xlsx.

[11] See DOL Office of Foreign Labor Certification, H-2B Temporary Non-Agricultural Labor Certification Program - Selected Statistics, FY 2013, reflecting that those landscaping positions constituted 38% of the H-2B positions certified in FY2013. Available at: http://www.foreignlaborcert.doleta.gov/pdf/H2B_Selected_Stati

period from July 2013 to March 2014, 1,240 prevailing wage determinations for landscape workers (SOC Code 37-3011) were based on employer surveys, accounting for 42.7% of all the prevailing wage determinations made for that occupation during that period. DOL approved 97.7% of those surveys at wage rates below the OES Skill Level II wage rate.[12]

We are convinced that we should not permit DOL to continue to discharge its investigatory and rule-making functions as it is doing now because its continued approval of skill-level wages submitted based on employer wage surveys is not only adversely affecting the wages of similarly employed United States workers, but the H-2B program as now administered is leading to unjustified disparities between employers who submit private wage surveys and otherwise similarly situated employers who do not submit surveys and who therefore must pay the OES prevailing wage. An agency's promise regarding prospective rulemaking has no effect on the ripeness of a challenge, like the one plaintiffs make here, when the challenged rules are being used as the basis of final agency actions. DOL's proposed rulemaking, in the context of its ongoing practices and the harm suffered by plaintiffs, does not

---

stics_FY_2013_YTD_Q4_final.pdf.

[12] Of the 1,240 prevailing wage determinations issued for SOC Code 37-3011 based on employer provided wage surveys in the July 2013 to March 2014 time period, 1,212 cases resulted in prevailing wage determinations below the depressed Skill Level II wage rate and 174 of these cases (14%) involved determinations at wage rates below the Skill Level I wage rate.

somehow render what otherwise would be a case ripe for litigation unripe. Accordingly, we conclude that this matter is ripe for adjudication, and we will review the validity of 20 C.F.R. § 655.10(f) and the 2009 Wage Guidance.

> B.  Section 655.10(f) Violates the Administrative Procedure Act.

We have considered but rejected remanding this case to the District Court so that it could decide the case on the merits. Rather, in the interest of judicial economy and because we recognize that workers in this country are being prejudiced by the current administration of the H-2B program, we will reach the merits of this controversy. In deciding to do so, we reiterate that it is "generally appropriate" for a court of appeals to reach the merits of an issue that a district court did not decide provided, as is true here, "the factual record is developed and the issues provide purely legal questions upon which an appellate court exercises plenary review." Hudson United, 142 F.3d at 159. "In such a case, an appellate tribunal can act just as a trial court would, so nothing is lost by having the reviewing court address the disputed issue in the first instance." Id.; see also N.J. Carpenters v. Tishman Constr. Corp., 760 F.3d 297, 305 (3d Cir. 2014) (deciding an issue under the Labor Management Relations Act that the district court did not reach).

We find support for our decision to reach the merits of the controversy in a recent court of appeals opinion dealing with a challenge under the APA to DOL's H-2A temporary labor certification rules. Mendoza v. Perez, 754 F.3d 1002 (D.C. Cir. 2014). There the court of appeals, after finding that the district court improperly had dismissed the case for lack of standing and

28

thus lack of jurisdiction, concluded that "[a] remand to the district court would be a waste of judicial resources" in light of the fact that "the district court has no comparative advantage in reviewing the agency action for compliance with notice and comment requirements. An appeal from any district court decision after remand is likely, and our review of the district court's decision would be de novo." Id. at 1020. The long litigation history of this matter shows that these considerations apply with equal force here.

> 1. Section 655.10(f) Violates 5 U.S.C. § 706(2)(D).

In considering this case on the merits, we determine first that Section 655.10(f) is procedurally invalid because DOL has not explained why it has been allowing employers to use private wage surveys in prevailing wage determinations when valid OES wage rates are available for the same purpose. An agency must show on the record that it has satisfied its obligation to supply a reasoned analysis when it departs from past policy. 5 U.S.C. § 706(2)(D). Without such analysis, a reviewing court may conclude that an agency has taken action without complying with procedures required by law. Id. When making a shift in policy, an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866 (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 242 (1962)). A reviewing court then "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of

29

judgment." Id. (citations and internal quotation marks omitted). A court will set aside an agency's action as "arbitrary and capricious" if the agency does not provide a "reasoned explanation" for its change in course. Massachusetts v. EPA, 549 U.S. 497, 534-35, 127 S.Ct. 1438, 1463 (2007); Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 981, 125 S.Ct. 2688, 2699-700 (2005) ("unexplained inconsistency" in agency practice is a reason for holding a policy reversal "arbitrary and capricious" under the APA, unless "the agency adequately explains the reasons for a reversal of policy"); see State Farm, 463 U.S. at 42–43, 103 S. Ct. at 2866-67; see also CBS Corp. v. FCC., 663 F.3d 122, 145 (3d Cir. 2011).

The history of this matter shows that prior to 2005, DOL would not consider employer wage surveys in prevailing wage determinations when an applicable governmental wage survey such as those of the DBA, SCA, or OES was available for that purpose. DOL changed that policy with the 2005 Wage Guidance, which authorized unlimited use of private surveys. At that time, DOL did not offer any explanation for that change in policy and it did not explain its policy change three years later when it codified the 2005 Wage Guidance as the 2008 Wage Rule, 20 C.F.R. § 655.10(b)(2) and (f) (2008). DOL's failure to offer an explanation in 2008 is unfortunate in light of public comments on the 2008 rule questioning the use of employer surveys where valid OES wage rates were available, especially inasmuch as some of the comments presciently warned that allowing private surveys in prevailing wage determinations would invite employers to undermine the OES wage rate. 73 Fed. Reg. at 78,031. Both in 2005 and in 2008, DOL should

30

have provided a "rational connection between the facts found and the choice made" with regards to these wage determinations. La. Forestry, 745 F.3d at 679 (citing State Farm Mut. Auto Ins., 463 U.S. at 43, 103 S.Ct. at 2866).

Finally, in 2011, DOL proposed adoption of a policy limiting the use of private employer surveys to situations in which a valid government survey was not available for the same purpose. 76 Fed. Reg. at 3459, 3465-66. In doing so, DOL publicly acknowledged that DBA, SCA, and OES surveys were the most reliable bases for setting prevailing wages and that "employer surveys are not, generally, consistently reliable." Id. at 3465. DOL also noted that "[e]mployers typically provide private surveys when the result is to lower wages below the prevailing rate . . . a result that is contrary to the Department's role in ensuring no adverse effect." Id. Yet when appropriation bill riders precluded the 2011 Rule from going into effect, DOL reversed its course again and issued its IFR in April 2013, allowing unlimited use of private surveys. The return to its post-2005 policy seems unjustifiable in light of DOL's findings in the 2011 rulemaking, but, as in 2005 and 2008, DOL offered no explanation for the change in its policy. DOL simply stated:

> This interim final rule will permit the use of employer-provided surveys in lieu of wages derived from the other sources, in order for DOL to provide the advice DHS has determined is necessary for it to adjudicate H-2B petitions.

78 Fed. Reg. at 24,054. This "explanation" is hardly sufficient for it merely explains what has been done, not why it was

done.[13]

We accordingly conclude that DOL has violated the APA by its repeated failures to provide explanations for its policy shifts. See 5 U.S.C. § 706(2)(D); La. Forestry, 745 F.3d at 679. Though we are aware that DOL faced considerable difficulty implementing the 2011 rule because of congressional appropriations riders precluding the spending of funds for that purpose, we nevertheless find DOL's scant explanations insufficient to comply with APA requirements.[14]

---

[13] DOL attempts to support its argument on this point by citing Gardner v. Grandolsky, 585 F.3d 786, 791 (3d Cir. 2009), but that case does not support its position. Gardner holds that when an "agency has articulated and acted on a consistent rationale throughout the course of a lengthy informal rulemaking process, the final rule is not arbitrary and capricious merely because the rationale was not fully reiterated in the final agency action." Id. at 793 (citations omitted). As the history of the administration of the H-2B program shows, DOL's actions are the antithesis of consistent. Its policy positions regarding private surveys have oscillated without explanation from 2005 to 2011 to 2013 and DOL has failed at every opportunity to "fully reiterate" its rationale for policy shifts.

[14] It is significant that no party challenges Congress's undoubted power to frustrate executive action by withholding appropriations necessary to implement that action. We also note that DOL has indicated that its decision to abandon the policies and factual findings in the 2011 rulemaking is explained in later-released Federal Register notices. However, the notices that

32

2.      Section 655.10(f) Violates 5 U.S.C. § 706(2)(A) as Arbitrary.

We next conclude that in addition to being procedurally flawed, Section 655.10(f) is substantively arbitrary, and, thus by adopting it, DOL violated 5 U.S.C. § 706(2)(A).  Under the APA, a reviewing court may set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  An agency acts arbitrarily and capriciously if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  State Farm, 463 U.S. at 43, 103 S.Ct. at 2867.

Given DOL's endorsement of the OES wages as "among

---

DOL references merely inform the public that the 2011 Wage Rule is not in effect due to an appropriations rider.  They do not draw a connection between the appropriations rider and some intentional attack on the private wage survey provisions in the 2011 Wage Rule – nor could they, as Congress itself offered no explanation for the adoption of the rider.  See Consolidated and Further Continuing Appropriations Act, 2012, Pub. L. 112-55, 125 Stat. 552, Div. B, Title V § 546 (2011); Consolidated Appropriations Act, 2012, Pub. L. 112-74, 125 Stat. 786, Div. F, Title I § 110 (2011); Continuing Appropriations Resolution 2013, H.J. Res. 117, 112 Cong., 126 Stat. 1313 (2012); Consolidated and Further Continuing Appropriations Act, 2013, Pub. L. 113-6, 127 Stat 198, Div. F, Title 5 (2013).

the largest, most comprehensive, and continuous statistical survey programs of the Federal Government," 78 Fed. Reg. at 24,053; 76 Fed. Reg. at 3463; 69 Fed. Reg. 77,326, 77,369 (Dec. 27, 2004), and its finding that the OES survey "is the most consistent, efficient, and accurate means of determining the prevailing wage rate for the H-2B program," 76 Fed. Reg. at 3465; see also id. (DOL stating that "employers typically provide private surveys when the result is to lower wages below the prevailing wage rate"), we are satisfied that DOL acted arbitrarily and capriciously when it permitted—and by its policies, structurally encouraged—employers to rely on details of a private survey when there was a valid OES wage survey available for use in determining the prevailing wage for the implicated employment. After all, DOL publicly has pointed out that employer surveys are generally unrealistic. See 76 Fed. Reg. at 3465 (DOL stating that "employers typically provide private surveys when the result is to lower wages below the prevailing wage rate"). Nonetheless, DOL has perpetuated a system by which employers are benefitted financially by submitting private surveys to justify wages lower than the OES wages, a practice that the interested parties in this case have well understood. As the District Court noted, "both sides acknowledge that employers pay for expensive private surveys aiming to obtain a wage rate that is lower than the available OES survey wage rate." CATA III, 2014 WL 4100708, at *5.

As a further illustration of the arbitrary nature of Section 655.10(f), we emphasize that this authorization creates a system that permits employers who can afford private surveys to bring H-2B workers into the country for employment at lower wages than employers who cannot afford such surveys and who

34

therefore must offer the higher OES prevailing wage. DOL's statistics for the Philadelphia metropolitan area demonstrate that this disparity can be considerable. From July 2013 to April 2014, DOL approved 115 prevailing wage applications for landscape workers in the Philadelphia metropolitan area. These approved applications included 32 based on the OES survey, which required a minimum payment of $14.04 per hour, and 83 based on employer surveys, which were approved at wage rates ranging from $9.16 to $11.22 per hour—a difference amounting to as much as $200 for a 40-hour workweek. This kind of disparity that harms workers whether foreign or domestic, is readily avoidable, and completely unjustified. After years of litigation, DOL cannot offer any rational justification for this policy as it leads to similarly situated workers in the same market in the same season bringing home widely disparate paychecks. See Nazareth Hosp. v. Sec'y of HHS, 747 F.3d 172, 179 (3d Cir. 2014) ("Agency action is arbitrary and capricious if the agency offers insufficient reasons for treating similar situations differently.").

Failure to consider relevant factors or provide an adequate explanation for an agency action are indeed among the "wide range of reasons why agency action may be judicially branded as 'arbitrary and capricious.'" FEC v. Rose, 806 F.2d 1081, 1088 (D. C. Cir. 1986). DOL has not attempted to demonstrate that it has considered the relevant factors brought to its attention by interested parties during the course of the rulemaking, or that it had made a "reasoned choice among the various alternatives presented." Nat'l Indus. Sand Ass'n v. Marshall, 601 F.2d 689, 700 (3d Cir. 1979). We conclude that 20 C.F.R. § 655.10(f) is arbitrary and capricious and was

35

adopted in violation of 5 U.S.C. § 706(2)(A).

C.     The 2009 Wage Guidance Violates the Administrative Procedure Act.

DOL has acted contrary to law because, when evaluating wage surveys based on skill levels pursuant to the 2009 Wage Guidance, DOL directly contradicts the current prevailing wage definition in 20 C.F.R. § 655.10(b)(2) (2013), adopted in response to CATA I, which rejects skill-level considerations. Agency rules that are inconsistent with or in violation of an agency's own regulations are unlawful. 5 U.S.C. § 706(2)(A) & (C); Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 2386 (1994). DOL admits as much as it "agrees that employer-provided surveys likely should not be based on the collection of wages at skill levels." See 76 Fed. Reg. at 3466-67. Despite this candid acknowledgement, DOL requests that we allow the 2009 Wage Guidance to remain enforceable until DOL completes its proposed rulemaking. But we see no reason to allow DOL to continue to use a wage guidance that contradicts its own rules.

It is particularly troublesome that use of the 2009 Wage Guidance violates 5 U.S.C. § 706(2)(A) and (C) in that the undercutting of the OES wage rate is impairing DOL's carrying out of Congress's statutory charge. Congress has charged DOL with the duty to ensure that it grants certifications only if they do not adversely affect wages and working conditions of United States workers, and it is the burden of DOL to be mindful of and honor that charge. However, employers increasingly have been submitting private surveys authorized by Section 655.10(f) in order to obtain a wage rate that is lower than the OES wage rate

36

indicates would be appropriate—the wage rate DOL itself has determined is necessary to avoid an adverse effect on foreign and domestic employee's wages. The 2009 Wage Guidance therefore establishes criteria contrary to both the letter and spirit of 5 U.S.C. § 706(2)(A) and (C), and DOL's use of it in the consideration of labor certification applications is unlawful.

### D. Vacatur is the Appropriate Remedy.

Finally we come to the remedy. Section 706(2) of the APA provides that a reviewing court shall "hold unlawful and set aside agency action" that violates the APA. 5 U.S.C. § 706(2). Ordinarily, reviewing courts have applied that provision by vacating invalid agency action and remanding the matter to the agency for further review. See, e.g., Abington Mem. Hosp. v. Heckler, 750 F.2d 242, 244 (3d Cir. 1984). Here it is particularly appropriate to remand the case with a vacatur because if we did not do so, we would leave in place a rule that is causing the very adverse effect that DOL is charged with preventing, and we would be "legally sanction[ing] an agency's disregard of its statutory or regulatory mandate." CATA II, 933 F. Supp. 2d at 714. DOL's explanations during oral argument made clear that it has no expectation of expeditious administrative review or rehabilitation of either the 2009 Wage Guidance or its broad employer survey rule, 20 C.F.R. § 655.10(f), despite DOL's recorded admission that Section 655.10(f)'s broad authorization of employer surveys "is contrary to the Department's role in ensuring no adverse impact." 76 Fed. Reg. at 3465.

We therefore act now to grant plaintiffs' vacatur request of 20 C.F.R. § 655.10(f) and the 2009 Wage Guidance. We hold

37

both provisions to be arbitrary and capricious and in violation of the APA. We direct that private surveys no longer be used in determining the mean rate of wage for occupations except where an otherwise applicable OES survey does not provide any data for an occupation in a specific geographical location, or where the OES survey does not accurately represent the relevant job classification. We note that DOL's existing regulations provide ample alternatives for setting prevailing wages including use of OES surveys. Moreover, DOL has the option of immediately issuing the employer survey portions of the 2011 rulemaking as an interim rule pursuant to 5 U.S.C. §§ 553(b)(B) and (d)(3). That rule offers rational, lawful limits on the use of employer surveys, already has gone through notice and comment, has been funded by Congress in its 2014 authorization, and has been upheld by this Court in Louisiana Forestry, 745 F.3d 653.[15]

## VI. CONCLUSION

---

[15] On January 17, 2014, the Consolidated Appropriations Act, 2014, Public Law 113–76, 128 Stat. 5, was enacted. Unlike past appropriations, that Act did not include a rider banning appropriations to implement, administer, and enforce the 2011 Wage Rule: For the first time in over two years, DOL's appropriations did not prohibit the implementation or enforcement of the 2011 Wage Rule. Wage Methodology for the Temporary Non–Agricultural Employment H–2B Program, 79 Fed. Reg. at 14,453; see also 76 Fed. Reg. at 3452. The parties agree that the 2011 Wage Rule now is funded fully.

For the aforesaid reasons, we will reverse the District Court's order dismissing this case on the ground that it is not ripe for review and hold that 20 C.F.R. § 655.10(f) and the 2009 Wage Guidance are arbitrary and capricious and adopted in violation of the APA. We grant plaintiffs' <u>vacatur</u> request of 20 C.F.R. § 655.10(f) and the 2009 Wage Guidance as we hold both regulations to be arbitrary and capricious and in violation of the APA. We will remand this case to the District Court for any further proceedings that may be necessary.